NEELY, Plaintiff in error, v. STATE, Defendant in error.†

Court of Appeals

*No. 77–499–CR. Argued August 24, 1978.—*
*Decided October 31, 1978.*
(Also reported in 272 N.W.2d 381.)

---

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

306

For the plaintiff in error the cause was argued by *Steven P. Weiss,* assistant state public defender, with whom on the briefs was *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

Before Decker, C.J., Brown and Bode, JJ.

BROWN, J. On October 16, 1976, the defendant was found guilty of first degree murder, contrary to sec. 940.01, Stats. The facts presented by the State are as follows.

During the early morning hours of December 11 or 12, 1975, Felix Winters and two other men robbed Isaac Haskins at his apartment. After the robbery, Haskins attempted to locate Winters. He and nine other men, including the defendant Robert Neely, went to the home of Winters' girlfriend, Kathy Lessard. In an attempt to get Ms. Lessard to tell them where Winters was, Neely injected pure heroin into Ms. Lessard's arm and held a gun to her son's head. Ms. Lessard then agreed to take the men to the home of Helen Wright where she had just

seen Winters. Helen Wright was the girlfriend of one of Winters' accomplices.

After forcing their way into Ms. Wright's home, Neely put a gun in Ms. Wright's face and demanded to know where Winters was. Ms. Wright informed them that Winters was in Chicago. She was then told to call Haskins when she heard from either Winters or his accomplices.

A few days later Winters called Haskins to talk about the robbery and make amends. Winters told Haskins that Neely had set him up for the robbery. Haskins agreed to talk to Winters and invited him to his home. Meanwhile, Haskins and three other men devised a plan to kill Winters. Neely was not present when these plans were made.

Sometime later when Neely arrived at Haskins' home, Haskins confronted Neely with Winters' statement that Neely had set him up for the robbery. Neely denied it. Haskins then told Neely to kill Winters in order to prove that he had nothing to do with the robbery. Neely agreed and Haskins told Neely the plan.

The plan was to have Neely and the three other men take Winters to Indiana for the ostensible purpose of finding the other two robbers. On the way to Indiana they were to tell Winters that they first had to stop in Kenosha to pick up some guns, thus providing an excuse for getting off the freeway at Highway 158. At a prescribed point on Highway 158, they were to fake a flat tire and get everyone out of the car. Neely would then kill Winters. Haskins also told Neely and the other men that no matter what Haskins said when he met with Winters, the men were to carry out the plan.

Haskins then met with Winters and told him that if he would go to Indiana and help his men find the other two robbers, he would probably be forgiven and allowed to make restitution. Winters agreed.

The men started out for Indiana, got off at Highway 158, and faked a flat tire. When everyone got out of the car, Winters realized what was about to happen and ran. Neely ran after him in pursuit and fired at him. Winters stumbled but kept running. Neely continued after Winters. Another man joined in the chase. The other two men stayed at the car and watched. Eventually Winters turned and ran back towards Neely. Another shot was fired and Winters fell. Neely then returned to the car and the four men drove back to Milwaukee. When they reached Milwaukee, they told Haskins the job had been completed.

Winters' body was found on December 27, 1975. An autopsy revealed that the cause of death was a bullet wound. Neely was then charged with first degree murder and a five day jury trial was held commencing on October 11, 1976.

At trial, Neely testified in his own behalf and set forth his version of the murder. Neely claimed that he had no knowledge of the murder plan. He claimed that his only involvement in the murder was that he was in the car when the murder took place. He testified that he bought drugs from Haskins occasionally, but that he was not a dealer for Haskins, nor was he part of Haskins' gang. He was an independent drug dealer.

On October 16, 1976, the jury found Neely guilty of first degree murder and, after motions for a new trial were denied, the defendant was sentenced to life imprisonment.

This writ of error is brought from the judgment of conviction. The issues presented on this appeal are:

(1) Did the trial court err in admitting evidence of the Wright-Lessard incidents in the State's case-in-chief?

(2) Did the trial court err in admitting evidence of the Wright-Lessard incidents in rebuttal?

(3) Is the defendant entitled to a new trial because the district attorney, in his closing argument, commented on defendant's silence?

(4) Did the trial court err in determining that the prosecutor's questioning of Neely on the Wright-Lessard incidents were within the proper scope of cross-examination?

(5) Did the trial court err in determining that, by taking the stand in his own defense, the defendant had waived his privilege against self-incrimination as to all matters relevant to the case?

(6) Did the trial court err in refusing to instruct the jury that no adverse inference could be drawn from the defendant's silence?

(7) Should the defendant be granted a new trial in the interest of justice?

## ADMISSIBILITY OF THE WRIGHT-LESSARD INCIDENTS IN THE CASE-IN-CHIEF

In the State's case-in-chief, Ms. Wright testified to the incidents that took place at her home on December 11 or 12, 1975, approximately a week before Winters was killed. The defendant objected to the admission of the evidence on the grounds that it was immaterial, irrelevant, and any probative value it may have had was outweighed by its prejudicial effect, thus making it inadmissible under sec. 904.03, Stats. The trial court concluded that the testimony was material because it tended to show Neely's motive for killing Winters. Based on its substantial probative value in showing motive, the trial court also concluded that its probative value was not outweighted by its prejudicial effect. We agree.

Evidence is material if it is offered to prove a proposition which is a matter in issue or probative of a matter in issue. McCormick, *Evidence* (2d Ed. 1972), §185, at

434. Motive was a matter in issue in this case and the evidence was offered to prove motive. Therefore, it was material.

Under sec. 904.01, Stats., relevant evidence is defined as any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." A fact that is of consequence to the determination of the action is a material fact. Any evidence which tends to prove a material fact is relevant. *State v. Becker,* 51 Wis.2d 659, 667, 188 N.W.2d 449, 453 (1971) ; *Oseman v. State,* 32 Wis.2d 523, 526, 145 N.W.2d 766, 768–69 (1966) ; McCormick, *Evidence* (2d Ed. 1972), §185, at 435. Even though the evidence is only a link in the chain of facts which must be proven to make the proposition at issue appear more or less probable, the evidence is still relevant. *Oseman v. State, supra.*

Here the Wright-Lessard evidence was offered to prove motive. The State's theory was that the Wright-Lessard incidents tended to show that Neely was an active participant in Haskins' plan to get revenge against Winters for robbing his home. Haskins' motive was revenge, and Neely's motive was to help Haskins and thereby assert his loyalty. The plan to get revenge and the simultaneous showing of loyal participation in the search for Winters began with the incidents at the homes of Ms. Wright and Ms. Lessard. Since the seeking of revenge was manifested there and was the first "link in the chain of facts" ending in Winters' murder, it was relevant to the main issue in the case—did Neely participate in the murder of Winters.

All relevant testimony is not admissible, however. It is excludable under sec. 904.03, Stats., if its probative value is substantially outweighed by the danger of unfair prejudice. In determining whether the probative

value of certain evidence is outweighed by its prejudicial effect, the trial court must balance the need the State has for the evidence against the likelihood that the jury will render a verdict based on an emotional reaction to this evidence. *Whitty v. State,* 34 Wis.2d 278, 294–95, 149 N.W.2d 557, 564 (1967); *Federal Advisory Committee's Note, Fed. R. Evid.* 403, reprinted with *Wisconsin Rules of Evidence,* sec. 904.03, 59 Wis.2d at R74. Assuming the evidence is prejudicial, generally, the prejudicial effect of the evidence will outweigh the probative value if the evidence is merely cumulative.

"Evidence of prior crimes or occurrences should be sparingly used by the prosecution and only when reasonably necessary. Piling on such evidence as a final 'kick at the cat' when sufficient evidence is already in the record runs the danger, if such evidence is admitted, of violating the defendant's right to a fair trial because of its needless prejudicial effect on the issue of guilt or innocence. *Whitty v. State,* 34 Wis.2d at 297, 149 N.W.2d at 565.

The test on appeal is whether the trial court abused its discretion in applying the balancing test. *Kelly v. State,* 75 Wis.2d 303, 319, 249 N.W.2d 800, 808 (1977). In this case, the evidence was prejudicial but it was not needless. All of the other evidence against Neely was supplied by his co-conspirators. They had all been given promises by the State for reduced charges or sentences in exchange for their testimony. Their testimony, while not incredible, was possibly suspect. Ms. Wright, however, had no impeachable motive for testifying. Thus, her testimony was necessary to corroborate the other witnesses. In addition, her testimony supplied the necessary facts to show that Neely was an active participant in the plan to gain revenge for the robbery of Haskins. Under these

circumstances, we do not feel the court abused its discretion in admitting the evidence.

## ADMISSIBILITY OF WRIGHT-LESSARD INCIDENTS ON REBUTTAL

After the defense had rested, the State called Ms. Lessard as a rebuttal witness. The defendant objected to her testimony on the basis that it was improper rebuttal. The defendant's claim was that since the defendant did not testify to any of the facts surrounding the Wright-Lessard incidents, Ms. Lessard's testimony could rebut nothing and was therefore improper. He also claimed that even if the testimony was proper rebuttal, its probative value was outweighed by its prejudicial effect.

As a general rule, rebuttal evidence is only admissible if it is intended to meet new facts put in evidence by the defendant in his case. *Rausch v. Buisse,* 33 Wis.2d 154, 167, 146 N.W.2d 801, 808 (1966). However, the trial court has considerable discretion in allowing or refusing to admit rebuttal evidence. *King v. State,* 75 Wis.2d 26, 42, 248 N.W.2d 458, 468 (1977) ; *Rausch v. Buisse, supra.* Regarding the scope of permissible rebuttal testimony, the Wisconsin Supreme Court, quoting from 3 Wharton's, *Criminal Evidence* (12th ed.), §913, has said:

It is proper to admit evidence of any acts or circumstances which are inconsistent with the relevant testimony of the witness. Any evidence, otherwise proper, which in any respect tends to contradict the witness, is admissible for this purpose. *State v. Watson,* 46 Wis.2d 492, 500, 175 N.W.2d 244, 248 (1970).

Here the defendant, in his testimony, attempted to paint himself as an innocent bystander to the murder with no knowledge of its planning. Consistent with the picture he painted of himself, the defendant denied the

existence of a gang led by Haskins that acted together to gain revenge against Winters for robbing Haskins. Ms. Lessard's testimony was introduced for the purpose of rebutting this testimony and impeaching Neely's credibility. Her testimony tended to show Neely's active participation with the gang in their revenge plan and thus tended to discredit his testimony. As such, it was proper rebuttal. The trial court did not abuse its discretion in admitting this testimony.

The defendant also contends that even if Ms. Lessard's testimony was proper rebuttal, it should have been excluded under sec. 904.03, Stats. He claims its probative value was outweighed by its prejudicial effect.

Ms. Lessard's testimony, like the testimony of Ms. Wright, was prejudicial and could evoke an emotional response from the jury. However, the test on appeal is not whether we think the probative value was substantially outweighed by the prejudicial effect, but rather whether the trial court abused its discretion in making its determination. *Kelly v. State, supra.* Here, the probative value was that it substantially discredited the defendant's testimony. While the State concedes that the Lessard testimony was not absolutely necessary to prove its case, it was not cumulative and was of great value. We do not feel, based on the record, that the trial court abused its discretion in admitting this evidence.

### DISTRICT ATTORNEY'S COMMENT ON DEFENDANT'S SILENCE DURING CLOSING ARGUMENTS

The defendant next argues that constitutional reversible error was committed by the district attorney during his closing argument to the jury. During his closing argument, the district attorney made the following comment on the defendant's silence between the time he was arrested and trial:

And first—and let us consider now some aspects of the defendant's testimony when he wanted to testify. Let us notice, first of all, that this murder occurred on December the 17th of 1975. On October the 14th, 1976, some ten months later, the defendant for the first time tells anyone about it.

In making this statement, the district attorney attempted to infer that the defendant's testimony at trial on October 14, 1976 was suspect. The inference the district attorney was attempting to create was that if the defendant was innocent, as he claimed to be in his testimony, he would have told his story earlier, either to the police when arrested or to the district attorney after arrest, but before trial.

Immediately after the statement was made by the district attorney, the defense counsel objected to the statement as being an improper comment on the defendant's fifth amendment right to remain silent. The trial court sustained the objection and made the following comment:

I am going to sustain that objection and I am going to instruct the jury that the defendant's right when told by the police or anyone else that he is under arrest is to receive a Miranda warning which tells him he has the right to remain silent. And, therefore, I am going to sustain that objection. There can be no comment made about the fact that the man remains silent. He has that right.

After the court's ruling and comment on its ruling, no motion for mistrial was made, nor was a special instruction requested.

The defendant now claims that (1) the district attorney's comment was error of a constitutional dimension; (2) no curative instruction given by the court could cure that error; (3) even if a curative instruction could cure the error, the court's comment on its ruling was not a curative instruction to the jury, and (4) even if the

court's comment was a curative instruction to the jury, it was insufficient to correct the error.

The comment by the district attorney was clearly improper. No inference whatsoever can be drawn from the defendant's silence prior to trial. If the fifth amendment means anything, it not only means that the defendant has the right to refrain from making statements that might tend to incriminate him, but it also means that the exercise of that right will not be used against him later in a criminal proceeding. *Cf. Brooks v. Tennessee,* 406 U.S. 605, 609–13 (1972) (the defendant alone has the right to determine if and when to testify). To tell a defendant that he has a right to remain silent and then later use the defendant's exercise of that right against him by attempting to impeach his testimony at trial with the inference that he would have told his story earlier if it were true, is fundamentally unfair. *Doyle v. Ohio,* 426 U.S. 610, 619 (1976).

The State argues that *Doyle* does not apply in this case because *Doyle* dealt with a comment on the defendant's silence during police interrogation after *Miranda* warnings were given to the defendant. While it is true that the court in *Doyle* specifically reserved a ruling on general pre-trial silence, we think the court's holding in *Doyle* applies to this case for a number of reasons.

First, the district attorney's comment was directed at the defendant's silence from the day of the alleged murder to the day he testified at trial. This time period included the period immediately after arrest during police interrogation after *Miranda* warnings had been given. During cross-examination of the defendant, the district attorney asked the defendant if he had been questioned by officers after arrest. When the defendant answered that he had, the district attorney asked why he had not told his story to the police at that time. While these questions were not objected to at the time they were

asked, and the defendant does not now claim error as a result of them, it is clear that when the district attorney made the comment on the defendant's pre-trial silence during his closing argument, he was referring not only to general pre-trial silence, but also to the defendant's silence during police interrogation. Since the district attorney's comment included a comment on the defendant's silence during police interrogation after *Miranda* warnings had been given, the comment was improper under *Doyle*.

Second, the court in *Doyle* held that it was fundamentally unfair to tell the defendant he had a right to remain silent and then later use the defendant's exercise of that right against him. In *Doyle*, the defendant was told he had the right to remain silent when he was given *Miranda* warnings. Thus, the court held that the defendant's silence immediately after being told he had that right—during police interrogation—could not be commented upon by the district attorney. In this case, the defendant was told he was guaranteed the right to remain silent by the United States Constitution. The fifth amendment to the United States Constitution affords the defendant the right to remain silent at all times, not just during police interrogation. When the United States Supreme Court decided *Miranda v. Arizona*, 384 U.S. 436 (1966), it did not create a new right for the defendant. It merely held that the constitutional guarantees already given to the defendant by the fifth and sixth amendments ought to be reiterated and explained to the defendant at a critical stage in the proceeding—during police interrogation—to insure that if the defendant talks he has knowingly and intelligently waived his fifth and sixth amendment rights. Thus, the promise that the defendant's silence will not be used against him was not made when *Miranda* warnings were given. It was made when the fifth amendment was passed as a part of our consti-

tution. The constitution gave the defendant the right to remain silent, and with that right follows the promise that defendant's exercise of that right would not be used against him. To say on the one hand that the constitution gives the defendant the right to remain silent, and on the other hand allow the district attorney to use the defendant's exercise of that right against him, is just as fundamentally unfair as when that right and promise is communicated by the police in giving *Miranda* warnings.

Consequently, while *Doyle* specifically reserved a ruling on a prosecutor's comment on general pre-trial silence, we believe that the *Doyle* rationale equally applies to a comment on any pre-trial silence. It is fundamentally unfair and a violation of due process to allow the prosecutor to comment on the defendant's pre-trial silence.

Having concluded that the prosecutor's comments were error of a constitutional dimension, we must decide whether a reversal is required.

As pointed out above, immediately after the prosecutor made the comment, the defense counsel objected to the comment. The trial court sustained the objection but no motion for mistrial was made nor was a special instruction requested. Under these circumstances, we do not think reversal is required.

In *State v. Baker*, 16 Wis.2d 364, 114 N.W.2d 426 (1962), the prosecutor had improperly questioned the defendant about his failure to submit to a polygraph examination. On appeal the defendant claimed that the questions were improper and required a reversal. The court stated:

We consider the question was improper. . . . But defendant's objection was prompt and the court just as promptly sustained the objection. Defendant's attorney

did not move for a mistrial, nor did he request the court to instruct the jury that the question was improper and should be disregarded. Apparently defendant was satisfied by the ruling sustaining the objection. At least he asked for nothing more although there might have been more for the asking. We do not regard the question so prejudicial under the circumstances that it should by itself result in a reversal. *Baker,* 16 Wis.2d at 368, 114 N.W.2d at 428.

Thus, where the objection is sustained, a motion for mistrial must be made in order to preserve the issue for appeal. If the motion for mistrial is denied and the defendant feels the curative instruction of the court is inadequate, a special instruction must be requested or it cannot be considered on appeal. *Rudolph v. State,* 78 Wis.2d 435, 446, 254 N.W.2d 471, 476 (1977); *State v. Cassel,* 48 Wis.2d 619, 623–26, 180 N.W.2d 607, 612 (1970). Without these requests, all we can assume is that the defendant was satisfied with the court's ruling and curative measure, and that he had no further objections. The defendant took his chances with the jury, curative instruction and all. If, on appeal, the defendant then claims that what the trial court did was not good enough, we must treat the issue as if no objection was made.

Where no objection is made during trial, the defendant is not entitled to have the error reviewed on appeal as a matter of right. *McClelland v. State,* 84 Wis.2d 145, 161, 267 N.W.2d 843, 850 (1978). Thus, the defendant's ability to rely on the error depends on whether the prosecutor's comment can be denominated "plain error" within the meaning of sec. 901.03(4), Stats. In the absence of "plain error," we must affirm. *McClelland v. State, supra,* citing *Virgil v. State,* 84 Wis.2d 166, 189, 267 N.W. 2d 852 (1978). *See also, United States v. Juarez,* 566 F. 2d 511, 517 (5th Cir. 1978).

An error which affects the substantial rights of the defendant is reviewable on appeal in order to determine if the error is "plain error" even though no objection was made at trial. Section 901.03 (4), Stats.

Here the defendant's right to remain silent guaranteed by the fifth amendment to the United States Constitution was violated. Constitutional violations are serious and affect substantial rights of the defendant. Since constitutional violations affect substantial rights of the defendant, they may be considered on appeal, even though no objection was made during trial. *Rudolph v. State, supra; State v. Johnson,* 60 Wis.2d 334, 343, 210 N.W. 2d 735, 740 (1973). However, not all constitutional errors are "plain errors." Some errors may be constitutional harmless errors. *Chapman v. California,* 386 U.S. 18, 21–22 (1967); *Pulaski v. State,* 24 Wis.2d 450, 456, 129 N.W.2d 204, 207 (1964). But where constitutional errors are involved, the standard of review on appeal is different. The burden shifts to the State to show that the error was harmless beyond a reasonable doubt. Before we may affirm, we must be convinced beyond a reasonable doubt that the improper evidence or comment played no part in the jury's verdict. *Chapman v. California,* 386 U.S. at 24–26; *Virgil v. State,* 84 Wis.2d at 192, 267 N.W.2d at 865; *Rudolph v. State,* 78 Wis.2d at 443, 254 N.W.2d at 474.

In determining whether an error is plain or harmless, the quantum of evidence properly admitted is relevant. *Chapman v. California,* 386 U.S. at 23–24; *Virgil v. State,* 84 Wis.2d at 191, 267 N.W.2d at 865; *Rudolph v. State,* 78 Wis.2d at 443, 254 N.W.2d at 474–75; *Reichhoff v. State,* 76 Wis.2d 375, 381, 251 N.W.2d 470, 473 (1977). The evidence against the defendant in this case was overwhelming. The testimony of the defendant's co-conspirators and the testimony of Ms. Lessard and Ms.

Wright, together with the defendant's continued refusal to answer certain questions on cross-examination in spite of the trial court's order to answer these questions, assured his conviction. Under these circumstances, we are convinced beyond any doubt that the prosecutor's statement during closing arguments had no effect whatsoever on the jury's verdict. Thus, while the prosecutor's comment was error of a constitutional dimension, it was not plain error requiring a reversal.

## *SCOPE OF CROSS-EXAMINATION*

At trial Neely took the stand in his own behalf. He testified to the events which occurred the day before the murder and the day of the murder. No mention was made in Neely's direct testimony about the incidents at Ms. Lessard's and Ms. Wright's apartments. Neely's defense was basically that he had no knowledge of the murder plan, was not the main actor in the murder plan, and was only named as a participant in the conspiracy because he happened to be in the car when the murder took place.

On cross-examination, the district attorney began asking Neely questions concerning the Wright-Lessard incidents. Neely's counsel objected to this aspect of the cross-examination on the grounds that Neely had a fifth amendment right not to answer. The fifth amendment claim was based on the theory that: 1) the cross-examination was beyond the scope of the direct; 2) since Neely was currently being prosecuted in separate cases in Milwaukee County for armed robbery and burglary as a result of the Wright-Lessard incidents, any statements he would make in that regard would be incriminating; and 3) the defendant did not waive his fifth amendment privilege regarding the armed robbery and burglary charges by taking the stand to testify. On advice of counsel, Neely refused to testify. The court ordered

Neely to testify and told him, out of the presence of the jury, that he would be held in contempt if he did not testify. On advice of counsel, Neely still refused to testify and asserted his fifth amendment privilege eight times in front of the jury. The trial court did not hold Neely in contempt.

Neely now contends that the court erred in ordering him to answer and in requiring him to assert his privilege in front of the jury. He asserts that a defendant who testifies in his own behalf affects only a partial waiver of his fifth amendment privilege. Neely argues that a defendant cannot be cross-examined on issues not covered by his direct testimony. According to Neely, a defendant's testimony is the sole measure of defendant's fifth amendment waiver. Under such a rule, since Neely did not discuss the Wright-Lessard testimony on direct examination, all questions concerning the Wright-Lessard incidents would be improper. Neely would then be entitled to invoke his fifth amendment privilege.

We disagree with Neely's argument. In *Boller v. Cofrances,* 42 Wis.2d 170, 183–84, 166 N.W.2d 129, 135 (1969), our supreme court specifically adopted the wide-open cross-examination rule now codified in sec. 906.11 (2), Stats. Under the wide-open cross-examination rule, the defendant may be cross-examined as *to any issue relevant to the whole of the case,* regardless of what the defendant actually testifies to on direct. *McClelland v. State,* 84 Wis.2d at 155, 267 N.W.2d at 847–48. It is clear that waiver and permissible cross-examination are not determined by what the defendant chooses to discuss during direct examination. *Brown v. United States,* 356 U.S. 148, 154–55 (1958); *Johnson v. United States,* 318 U.S. 189, 195 (1943); *United States v. Hearst,* 563 F.2d 1331, 1340 (9th Cir. 1977), *cert. denied,* 46 U.S.L.W. 3360 (1978).

Therefore, in determining whether the questions were proper cross-examination, the only question is whether the Wright-Lessard incidents were relevant to the whole of the case against Neely. If the incidents were not relevant, the prosecution had no right to bring the matter up on cross-examination.

Neely's whole direct examination was that he was not a part of Haskins' gang; he merely bought drugs from Haskins. He had no knowledge of the murder plan and had no reason to kill Winters. The questions asked on cross-examination relating to the Wright-Lessard incidents were intended to impeach Neely's story. They were intended to show that Neely was a part of Haskins' gang, that he had acted on Haskins' behalf before, that he was an active participant in attempting to gain revenge against Winters for Haskins, and that he was actively involved in the murder plan, the foundation of which began with the Wright-Lessard incidents. Since these questions went to Neely's credibility and motive, they were relevant to the case and were proper questions for cross-examination. *McClelland v. State*, 84 Wis.2d at 155, 267 N.W.2d at 847–48.

## WAIVER OF FIFTH AMENDMENT PRIVILEGE

As stated above, the questions regarding the Wright-Lessard incidents were within the scope of proper cross-examination. Under ordinary circumstances, the defendant would be required to answer the questions. However, in this case the defendant not only refused to answer the questions on the grounds that they were beyond the scope of the direct examination and therefore improper questions on cross-examination, but he also asserted his fifth amendment privilege against self-incrimination.

His claim was that even if the questions were proper questions for cross-examination, his answers to those questions might incriminate him in his pending trial in Milwaukee. Without some sort of immunity, his statements made during the present trial could be used against him in his subsequent trial. Thus, the defendant argued that he had a fifth amendment privilege not to answer the questions on cross-examination, independent of the rules on cross-examination, and that he had not and would not waive that privilege.

The State argues that under *Brown v. United States,* 356 U.S. 148 (1958) ; *Johnson v. United States,* 318 U.S. 189 (1943) ; *Fitzpatrick v. United States,* 178 U.S. 304 (1900) ; and *United States v. Hearst,* 563 F.2d 1331 (9th Cir. 1977), *cert. denied,* 46 U.S.L.W. 3360 (1978), once the defendant takes the stand and testifies, he has waived his privilege against self-incrimination, not only for this trial, but for any future criminal proceeding. He must therefore answer all relevant questions. In *Johnson* the United States Supreme Court stated:

> The case of an accused who voluntarily takes the stand and the case of an accused who refrains from testifying (*Bruno v. United States,* 308 U.S. 287, 60 S. Ct. 198, 84 L. Ed. 257) are of course vastly different. *Raffel v. United States,* 271 U.S. 494, 46 S. Ct. 566, 70 L. Ed. 1054. His "voluntary offer of testimony upon any fact is a waiver as to all other relevant facts, because of the necessary connection between all." (Citations omitted.) 318 U.S. at 195.

And in *Brown* the court stated:

> If [a defendant in a criminal case] takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination. 356 U.S. at 154–55.

.

Similar statements were made in *Fitzpatrick* and *Hearst.*

However, all of these cases merely hold that when a defendant takes the stand and testifies, he waives his fifth amendment privilege *for purposes of that trial.* The rationale behind the holding in all these cases is that when a defendant takes the stand and testifies in his own defense, he cannot prevent the prosecution from attacking his credibility or going into other relevant matters by then asserting his fifth amendment privilege. Once the defendant has told part of the story on direct, he must tell the whole story if asked on cross-examination. Otherwise, by means of a selective assertion of the privilege, the defendant could pick and choose what he wanted the jury to hear.

We do not disagree with these holdings or their rationale. Once the defendant takes the stand, he must answer all relevant and proper questions asked of him. He is not permitted to tell what is favorable and then hide behind the privilege to prevent the jury from hearing the unfavorable. He has waived the right to prevent the jury from hearing the unfavorable by taking the stand.

However, when the policies behind the waiver rule are examined, it is clear they do not require a holding that when the defendant testifies he waives his fifth amendment privilege, not only for purposes of this trial, but also for any subsequent criminal trial. The scope of cross-examination does not necessarily determine the scope of the witness' waiver of his fifth amendment privilege. McCormick, *Evidence* (2d Ed. 1972), §132, at 280; *Federal Advisory Committee's Note,* Fed. R. Evid. 611 reprinted with *Wisconsin Rules of Evidence,* sec. 906.11 (2), 59 Wis.2d at R191. As a result, a conflict or dilemma is created. The prosecutor has a right to cross-examine the defendant and bring all relevant facts before the

jury. The defendant has a right to refrain from incriminating himself in the subsequent proceedings. The defendant has not necessarily waived his right in the second trial by taking the stand and subjecting himself to cross-examination in the first trial.

A similar conflict or dilemma was faced by the Wisconsin Supreme Court in *State v. Evans,* 77 Wis.2d 225, 252 N.W.2d 664 (1977). The facts in *Evans* reveal that while Evans was on probation, he was arrested and charged with numerous offenses involving conspiracy to deliver cocaine and marijuana. The complaint alleged that the conspiracy took place in Milwaukee on November 28 and 29, 1975. When the charges came to the attention of the Bureau of Probation and Parole, two agents interviewed Evans and demanded an accounting of his whereabouts on November 28 and 29, 1975. Under his probation agreement, Evans was required to inform his probation agent of his whereabouts and activities at all times. When asked about his whereabouts and activities on those two days, Evans refused to answer on the grounds that his answers might incriminate him in his subsequent criminal trial. As a result of his refusal to answer, he was revoked for failing to account for his whereabouts and activities as required by his probation agreement. Evans appealed his revocation and on appeal claimed that, since any statements he made to his probation agent could be used against him in his subsequent criminal trial, he had a fifth amendment privilege to refuse to answer and that revoking him for exercising that privilege violated due process.

In deciding *Evans,* the supreme court recognized the importance of the requirement that a probationer or parolee keep his agent informed of his whereabouts and activities, but further recognized the dilemma the probationer or parolee faced if he was required to answer questions and the answers could later be used against

him in a criminal proceeding. To resolve this dilemma, the court created a limited use immunity. To preserve the integrity of the probation and parole system, the probationer or parolee must answer the questions relating to his whereabouts and activities, and his answers can, of course, be used against him in any parole or probation revocation proceeding. But, the parolee's or probationer's statements, or any evidence derived from those statements, cannot be used against him in any subsequent criminal proceeding.

The dilemma Evans faced is precisely the same dilemma Neely faced here. He was required to answer questions on cross-examination relating to the Wright-Lessard incidents. If he refused to answer, adverse inferences could be drawn by the jury and his entire testimony disregarded if the jury chose to do so. On the other hand, if he wished to avoid the adverse inferences of the jury, he had to answer the questions on cross-examination and incriminate himself in his other trial.

As in *Evans*, this dilemma can be avoided. The policies behind requiring a defendant to answer all relevant questions on cross-examination so that the jury can hear all of the facts, not just those the defendant wants them to hear, can be satisfied by holding, as the courts did in *Johnson, Hearst, Fitzpatrick* and *Brown*, that once the defendant takes the stand he has waived his fifth amendment privilege and must answer all relevant and proper questions. However, that is as far as the waiver goes. The State has no interest in seeing that the defendant also waives his privilege for any subsequent proceeding. Thus, in order to preserve the defendant's right against self-incrimination guaranteed by the fifth amendment to the United States Constitution, applicable to the State under the due process clause of the fourteenth amendment, and his right against self-incrimination guaran-

teed by article I, section 8 of the Wisconsin Constitution, we are now holding that those statements, and any evidence derived from those statements, cannot be used against the defendant in any subsequent criminal proceeding. They are a form of a coerced statement for purposes of the second or subsequent criminal proceeding and thus are inadmissible. Since there may be incidents when the defendant intentionally waives his privilege for both trials, an appropriate motion must be filed with the court at the time the incriminating questions are asked. Once the appropriate motion is filed asserting the privilege, the statements, and any evidence derived from the statements, will be deemed coerced and inadmissible for any purpose in a subsequent criminal proceeding. The defendant must, however, make a timely motion to exclude the evidence at the subsequent criminal proceeding. Any use of those statements at a subsequent criminal proceeding would then be in violation of the defendant's rights under the fifth amendment to the United States Constitution. Independent of any violation of the defendant's fifth amendment rights, any use of those statements in a subsequent criminal proceeding would be in violation of article I, section 8 of the Wisconsin Constitution.

Since Neely did not know his statements on cross-examination would be considered coerced and thus inadmissible in the subsequent trial, the only question that remains is whether he is entitled to a new trial as a matter of due process. We think he is not.

Before Neely took the stand he knew, or should have known, that the State would attempt to cross-examine him on matters relating to the Wright-Lessard incidents. Since he felt it was necessary for him to take the stand and testify, he had two choices available to him. First, prior to his taking the stand, he could have made a motion in limine advising the court that he desired to take

the stand and testify, but that questions that might be asked on cross-examination would incriminate him in a subsequent criminal proceeding. The court at that point could determine the extent of the defendant's waiver and the scope of cross-examination, and advise both the defendant and the State, in advance, of what would happen if the defendant took the stand. If the defendant felt the court was wrong in its ruling on the motion in limine, he could refuse to testify altogether and raise the issue on appeal if convicted. Having brought the motion in limine, the issue would have been preserved for appeal.

The second choice the defendant had was to testify on direct, without first advising the court of the fifth amendment problem, and take the chance that either the State would not ask the incriminating question on cross-examination, or if the State did, the court would rule that the defendant did not have to answer. Neely chose this second alternative and in doing so took the chance that if the incriminating questions were asked, the court would rule against him and order him to answer. Because Neely chose to take this chance, we feel he cannot now complain.

Once the defendant took the stand and testified, he subjected himself to the power of the court. Once the court had ordered him to testify, his only recourse was to answer the questions. As was stated in *United States v. United Mine Workers of America,* 330 U.S. 258, 293 (1947), "an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." This is especially true when the order is issued during trial. *Maness v. Meyers,* 419 U.S. 449, 459 (1975) ;[1] *e.g., Illinois v. Allen,* 397 U.S. 337 (1970).

---

[1] While the court in *Maness* stated that there may be circumstances where a defendant or a witness may refuse to answer questions after being ordered by the court to do so, particularly when

While the rule may be different for situations where there is no remedy once the order of the court has been obeyed,[2] here the defendant had a remedy. If the State attempted to use the statements against him in a subsequent criminal proceeding, the proper remedy would be to raise the issue of coercion then. If the statements were still used against him, despite his objection, the issue would be properly preserved for appeal, if convicted.

While a similar argument was raised in *Evans* and rejected by the court, we think this case can be distinguished from *Evans*. Evans had no way of getting a court ruling on his claim of privilege. The agent told him he had to answer and his attorney told him he had a right to refuse to answer. The only way Evans could get a judicial determination of his privilege for purposes of the subsequent trial before he answered was to refuse

---

the refusal is based on the fifth amendment privilege against self-incrimination, the court also stated that the defendant or witness does so *at his own risk*. If, on review, the appellate court finds that defendant or witness had no privilege and should have answered, he may be punished for criminal contempt. If the defendant or witness wishes to avoid that risk of punishment for criminal contempt, the proper procedure is to answer and appeal the issue after trial.

[2] In cases where the privilege asserted is a privilege other than the fifth amendment privilege, the rule may be different. The purpose of most other privileges is to permit the person claiming the privilege to keep the matter secret *from everyone* for any purpose. If the claimant is then required to disclose the information protected by the privilege, the privilege is destroyed forever. The information is out and cannot be put back in by any appellate ruling. Thus, the only way to preserve the privilege is to disobey the order of the court. The fifth amendment privilege, however, is different. The fifth amendment privilege merely protects a defendant from having his statements used against him in any criminal proceeding. If a defendant is erroneously ordered to disclose matters which incriminate him, the privilege is not lost forever. A new trial or hearing can be ordered excluding the incriminating statement.

to answer, have his probation revoked for refusing to answer, and then appeal the revocation. That is precisely what Evans did. Neely, on the other hand, could have gotten a judicial determination *before* he was faced with the dilemma of either refusing to answer or incriminating himself. He could have filed his motion in limine. While failure to make a motion in limine does not waive any of the defendant's rights, it does determine when the defendant can raise the issues. Neely made the tactical decision to raise his privilege during cross-examination. That decision did not work to his advantage. He is not now entitled to a new trial to try a different tactic. By failing to raise the issue prior to his taking the stand, we think he limited his remedy to raising the issue at the subsequent proceeding. His objections during cross-examination were sufficient to preserve the issue of coercion for the later proceeding.

While we do not feel Neely is entitled to a new trial, we do wish to reiterate our earlier holding. In future trials where a defendant is faced with a similar dilemma, once he testifies on direct, he must answer all proper questions asked on cross-examination. If the answers to those questions might incriminate him in a subsequent criminal proceeding, an objection on those grounds will preserve the defendant's fifth amendment privilege for purposes of the second trial. If the defendant does not wish to have those statements used against him at a subsequent criminal proceeding, all he need do is make a timely objection at the subsequent proceeding and the statements, and any evidence derived therefrom, will be deemed coerced and inadmissible for any purpose.

## INSTRUCTION TO THE JURY

The defendant's next contention is that the court erred in refusing to instruct the jury that no inference could

be drawn from the defendant's refusal to answer questions. The defendant asserts that under *Griffin v. California*, 380 U.S. 609 (1965) when a defendant exercises his privilege against self-incrimination and refuses to testify, no adverse inference can be drawn from his silence.

In *Griffin*, the defendant exercised his constitutional right not to take the stand. He properly asserted his privilege against self-incrimination. What the court held in *Griffin* was that no adverse inference could be drawn from a defendant's decision not to take the stand. The situation is quite different where the defendant waives his privilege by taking the stand. In such a case, if the defendant then refuses to answer questions by asserting the privilege he has waived, the assertion of the privilege is improper and an adverse inference can be drawn. *Caminetti v. United States*, 242 U.S. 470, 494 (1917); *United States v. Brannon*, 546 F.2d 1242, 1247 (5th Cir. 1977); *see also Johnson v. United States*, 318 U.S. 189, 196 (1943). Thus, the court did not err in refusing to give the defendant's requested instruction that no adverse inference could be drawn. Further, the defendant did not object to the actual instruction given by the court.

## INTEREST OF JUSTICE

Lastly, the defendant argues that he should be given a new trial in the interest of justice.

Before this court can exercise its discretionary powers under sec. 752.35, Stats., created by ch. 187, 1977 Wis. Laws, and grant a new trial in the interest of justice, this court must be convinced that the defendant should not have been found guilty. *McAdoo v. State*, 65 Wis.2d 596, 612, 223 N.W.2d 521, 530 (1974); *State v. Hunger-*

*ford,* 54 Wis.2d 744, 751, 196 N.W.2d 647, 651 (1972). It must also appear that a new trial would probably result in acquittal. *State v. Lindsey,* 53 Wis.2d 759, 769, 193 N.W.2d 699, 704 (1972); *State v. Heidelbach,* 49 Wis.2d 350, 360, 182 N.W.2d 497, 501 (1971). We do not believe that the defendant should not have been found guilty, nor do we believe that a retrial would probably result in an acquittal. Therefore, we decline to exercise our discretionary power and grant a new trial in the interest of justice.

*By the Court.*—Affirmed.

DECKER, C.J. (concurring). Although I concur in the judgment of the court, I am unable to join in that part of the majority's opinion that purports to create use immunity that would prohibit testimony in one criminal case from use against the witness in another criminal case.

As the majority correctly notes, Neely never did testify in this case to matters that would incriminate him in the pending Milwaukee case charging him with armed robbery. Because it addresses an issue that is unnecessary to the determination of this case,[1] the opinion is advisory on the subject of use immunity. In plowing new ground unnecessarily, the majority embarks upon advice to the bench and bar with respect to a restrictive interpretation of waiver of the privilege against self-incrimination.

The weakness of this advisory opinion is apparent because it lacks the underpinning of a factual basis. Absent a factual basis, the *ratio decidendi* of the opinion offers a little prospect for reasoned growth and development because it lacks a foundation and structure that

---

[1] *Schumm v. Milwaukee County,* 258 Wis. 256, 45 N.W.2d 673 (1951); *In re Cooper's Will,* 253 Wis. 550, 34 N.W.2d 667 (1948); *City of Waukesha v. Schessler,* 239 Wis. 82, 300 N.W. 498 (1941).

furthers analysis.[2] For example, the opinion does not answer these questions about the use immunity that the majority purports to establish:

1. Is use immunity available to any witness or only an accused?

2. Is use immunity grounded upon a principle of waiver in interpreting evidentiary principles or is it a principle of constitutional dimension?

3. Is use immunity a due process right to present a defense or an implementation of the fifth amendment privilege against self-incrimination?

4. What will be the effect of use immunity upon the confrontation right of a codefendant? Will it require severance? When should the claim of use immunity be brought to the attention of the trial judge?

5. What notice will be given the prosecutor in the "other" case?

6. Will the use immunity fall to impeachment if the witness testified in the second case in a fashion contrary to his testimony in the first?

7. Does use immunity extend to criminal activity unknown until the testimony and will knowledge of that activity become "fruit of the poisonous tree"?

8. Is the use immunity purportedly created violative of sec. 905.01, Stats.?

9. In a multiple count information or indictment, can testimony with respect to one count acquire use immunity for another count?

10. Does the use immunity prohibit the recall of the witness in the same proceeding?

11. Does the use immunity prevent use of the testimony in a retrial of the same offense?

13. Is use immunity prospective or retroactive in its application?

---

[2] See Frankfurter, "*A Note on Advisory Opinions,*" 37 Harv. L. Rev. 1002 (1924).

The list is incomplete but it serves to illustrate the wisdom of Sam Johnson's observation "whatever is formed for long duration arrives slowly to its maturity."

Although usually inappropriate, an advisory opinion by a court of last resort has the virtue of finality in its advice to the bench and bar.[3] Thoughtful and innovative development of the law is not the exclusive province of courts of last resort. Nevertheless, in the second month of this court's operation, appeals have been filed at a rate of 146 percent of the expected capacity of this court when it was created by the Legislature less than a year ago. Merely addressing the issues presented by a case will exhaust the court's capacity.[4]

I cannot concur in the majority's broad statement that comment on *any* pretrial silence is error. I agree that the comment in this case was error because it included post-*Miranda* warning pretrial silence.

[3] *Cf. State ex rel. Jackson v. Coffey,* 18 Wis.2d 529 118 N.W.2d 939 (1963).

[4] *Saveland v. Green,* 36 Wis. 612 (1875).