Robert J. NEELY, Plaintiff in error-Petitioner,

v.

STATE of Wisconsin, Defendant in error.†

Supreme Court

*No. 77–499–CR.   Argued May 7, 1980.—Decided June 9, 1980.*

(Also reported in 292 N.W.2d 859.)

† Motion for reconsideration denied, without costs, on July 21, 1980.

For the plaintiff in error-petitioner the cause was argued by *Steven P. Weiss*, assistant state public defender, with whom on the briefs was *Richard L. Cates*, state public defender.

For the defendant in error the cause was argued by *David J. Becker*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

WILLIAM G. CALLOW, J. The principle issue raised on this review concerns the extent to which a criminal defendant who takes the stand in his defense waives his Fifth Amendment privilege against self-incrimination.

## I.

On December 11 or 12, 1975, Felix Winters, the deceased, and two other men robbed Isaac Haskins at his apartment. After the robbery, Haskins attempted to locate Winters. He and nine other men, including Robert Neely, the defendant, went to the house of Winters' girl friend, Kathleen Lessard. Lessard testified that, when she arrived sometime later, a gun was put to her head, and she was directed into the dining room. Haskins told her that her boyfriend, Winters, had just robbed him, and he wanted to know where he was. He told her she had better help find Winters or she would never see Winters again. The defendant injected heroin into both of Lessard's arms, stating that it was pure and that she would probably die from it, but that it would probably make her talk and reveal the whereabouts of Winters. One of Haskins' and Neely's companions held a gun to Lessard's son's head, and her house was ransacked. Lessard agreed to take the men to the home of Helen Wright where she had just seen Winters distributing the proceeds of the robbery. At the time of these events, Wright and Lessard, as well as Haskins, resided in Milwaukee county.

Wright was the girl friend of one of Winters' accomplices. Accompanied by Lessard and another man, the defendant forced his way into Wright's home. Wright testified the defendant put a pistol to her face and demanded to know the whereabouts of her boyfriend. Wright informed him that Winters was in Chicago. After retrieving from Wright some of the money Winters had taken from Haskins, the defendant made a phone call. Isaac Haskins arrived and told Wright he had been robbed and wanted his money back. Wright was then told to let Haskins know if her boyfriend contacted her. Several days later Winters phoned Haskins to apologize and to offer restitution.

Testimony presented on behalf of the state related the following account of Winters' murder. Several days after the robbery, Haskins confronted the defendant with Winters' statement that the defendant had set up Haskins for the robbery. The defendant said it was a "damn lie." Haskins asked the defendant if there was "anything that he was going to do about it." The defendant responded that he was going to kill Winters. Haskins then told the defendant the plan for killing Winters, which was subsequently followed.

Neely and the three other men started out with Winters for Indiana for the ostensible purpose of finding the other two robbers. As an excuse for getting off the freeway at Highway 158, they told Winters they were going to Kenosha to get some guns. About half a mile east of the interstate, the men faked a flat tire. The driver pulled over and everyone got out of the car. At that point the defendant was supposed to shoot Winters, but Winters realized what was about to happen, ran across the road, and disappeared down an embankment with the defendant in pursuit, firing at him. When the first shot was fired, Winters "kind of stumbled" but kept running. The defendant went down the embankment and followed Winters across a field. Another man joined in the chase. Eventually, Winters turned and ran back toward the defendant. Another shot was fired and Winters fell. The defendant then returned to the car, and the four men drove back to Milwaukee, telling Haskins, upon arrival, that the job had been completed.

Winters' body was found on December 27, 1975. An autopsy revealed that the cause of death was a bullet wound to the left side of the body.

The defendant was charged with first-degree murder. After a five-day trial, a jury found him guilty. Motions for a new trial were denied, and the defendant was sentenced to life imprisonment. On review, the court of

appeals affirmed the judgment of conviction. *Neely v. State,* 86 Wis.2d 304, 272 N.W.2d 381 (Ct. App. 1978).

## II.

At trial, the defendant took the stand in his defense. On direct examination, he testified with respect to his actions on the day the murder was committed. Denying any knowledge of the murder plan, he claimed his only involvement in the murder was that he was in the car when the murder took place. He did not, on direct examination, testify with respect to the events which occurred some days earlier at the homes of Wright and Lessard, events which were the subject of a pending criminal prosecution in Milwaukee county.

On cross-examination, the district attorney sought to question the defendant regarding those events. The defendant refused to answer the questions on the grounds that his answers might tend to incriminate him and persisted in his refusal even after the court ordered him to answer. He asserted his Fifth Amendment privilege seven times in the presence of the jury.

On this review, the defendant maintains he was within his right to refuse to answer questions regarding the Wright and Lessard incidents on cross-examination. According to the defendant, his testimony on direct examination is the limit of the waiver of his Fifth Amendment privilege which occurred by his taking the witness stand. Because he never mentioned the Wright and Lessard incidents during direct examination, he claims he never waived his Fifth Amendment privilege to refuse to answer questions regarding those occurrences.

Under Wisconsin's evidentiary rule normally applicable to a witness, there can be no doubt that the Wright and Lessard incidents were proper subjects of cross-examination. Sec. 906.11(2), Stats., provides that "[a]

witness may be cross-examined on any matter relevant to any issue in the case." At the defendant's trial, the Wright and Lessard incidents tended to show the defendant's motive for killing Winters. As the court of appeals recognized, "[Haskins'] plan to get revenge and the [defendant's] simultaneous showing of loyal participation in the search for Winters began with the incidents at the homes of Ms. Wright and Ms. Lessard." *Neely v. State, supra* at 311. The incidents illustrate the defendant's active involvement in Haskins' efforts to find and kill Winters. As such, the Wright and Lessard incidents were relevant in order "to complete the story of the crime." *Holmes v. State,* 76 Wis.2d 259, 269, 251 N.W.2d 56 (1977). Once the defendant "opened the door on direct by testifying on the merits of the case," cross-examination "of all facets of an alleged crime" are permitted under Wisconsin's "wide-open" cross-examination rule. *Boller v. Cofrances,* 42 Wis.2d 170, 184, 166 N.W. 2d 129 (1969). The cross-examination of the defendant concerning the Wright and Lessard incidents was proper under Wisconsin's Rules of Evidence. However, an evidentiary rule on the scope of cross-examination does not determine the extent to which a defendant who elects to testify thereby waives his privilege against self-incrimination; the question is a constitutional one.[1]

The defendant asserts that Wisconsin's "wide-open" cross-examination rule cannot be applied to a defendant in a criminal case, in that the rule is in conflict with the

---

[1] *See:* Sec. 906.11(2), Federal Advisory Committee's Note, Wisconsin Rules of Evidence, 59 Wis.2d R190–91 (1974). *See also:* McCormick, *Evidence,* sec. 26 (2d ed. Hornbook Series 1972): "[I]t may be that the scope of cross-examination of the accused in a criminal case is not controlled solely by evidence case law, and statutes or rules governing the matter. The outer limits of cross-examination may well be controlled, at least in the future, by constitutional doctrine concerning the extent to which the accused waives his privilege of self-incrimination by taking the stand and testifying." (Footnote omitted.)

defendant's privilege against self-incrimination. He contends that an accused who chooses to testify in his behalf effects only a partial waiver of his Fifth Amendment right; and that the waiver is coextensive with the scope of his testimony on direct examination. Thus he claims that cross-examination purely collateral to the subject matter of the direct examination, although not improper under the "wide-open" rule, is constitutionally impermissible.

"The extent to which a person waives his privilege by testifying is the subject of conflicting decisions." Morgan, *The Privilege Against Self-Incrimination*, 34 Minn. L. Rev. 1, 42 (1949).[2] One view commonly shared is that a defendant who takes the stand waives his privilege as to every fact except facts merely affecting credibility. This is the view favored by Wigmore.[3] Federal decisions make the waiver less extensive and "imply that the accused and every other witness is subject to cross-examination upon all matters relevant to the content of his direct examination." *Id.* at 42–43.[4] At the opposite extreme from Wigmore, there is the English rule that the privilege may be claimed at any moment; virtually no waiver is conceded.[5] The United States Supreme Court has not expressly held any single view to be constitutionally required in all cases. By the time a defendant charged with a federal offense was given the capacity to testify in his own behalf,[6] the federal courts had

---

[2] Wigmore enumerates six different points of view, 8 Wigmore, *Evidence*, sec. 2276, 462–69 (McNaughton Rev. 1961); Morgan concludes "[the] cases exhibit at least seven different views." Morgan, *Basic Problems of State and Federal Evidence*, 163 (5th ed. J. Weinstein 1976).

[3] 8 Wigmore, *supra* at 459–62, 465–66. Under this view, application of the wide-open rule to a criminal defendant presents no constitutional problems.

[4] *See also:* McCormick, *Evidence, supra,* sec. 132 at 278–79.

[5] 8 Wigmore, *supra* at 469.

[6] 20 Stat. 30 (1878), as amended 62 Stat. 833 (1948), 18 U.S.C. sec. 3481 (1964).

adopted a restrictive rule of cross-examination.[7] Consequently, the question of the extent of the waiver by testifying rarely arose because the rule limiting the scope of permissible cross-examination would bar questions about matters not brought out on direct without reference to whether the defendant had waived his privilege against self-incrimination by testifying. In those states, such as Wisconsin, which allow wide-open cross-examination, the federal constitutional question had not been presented prior to the decision of *Malloy v. Hogan*, 378 U.S. 1 (1964), in which it was established that the Fifth Amendment guarantee of freedom from self-incrimination is imposed on the states by way of the Fourteenth Amendment.

However, whether a defendant who takes the stand waives his privilege to the full scope of cross-examination permissible under Wisconsin's evidentiary rules is an issue we need not determine. The record shows the cross-examination in this case comes well within the scope of matters that a defendant is deemed to waive when he takes the stand.

It is well established that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination. *McGautha v. California*, 402 U.S. 183, 215 (1971); *State v. Allen*, 91 N.M. 759, 581 P.2d 22, 25 (Ct. App. 1978). In *Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900), the case providing the strongest support for the view that the defendant's waiver does not extend to matters wholly outside the direct examination although material to the case,[8] the Court stated:

---

[7] *See:* Carlson, *Cross-Examination of the Accused,* 52 Cornell L. Q. 705, 708 (1967).

[8] *See:* Carlson, *supra* at 712–13; Carlson, *Scope of Cross-Examination and the Proposed Federal Rules,* 32 Fed. Bar J. 244, 250–51 (1973).

"Where an accused party waives his constitutional privilege of silence, takes the stand in his own behalf and makes his own statement, it is clear that the prosecution has a right to cross-examine him upon such statement with the same latitude as would be exercised in the case of an ordinary witness, *as to the circumstances connecting him with the alleged crime.*" (Emphasis added.)

The court further indicated that a defendant may "be compelled to answer as to any facts . . . relevant to his direct examination. *Id.* at 316. Similarly, in *Johnson v. United States,* 318 U.S. 189, 195–96 (1943), and in *Brown v. United States,* 356 U.S. 148, 154–56 (1958), the court reiterated the test of relevancy. In *Johnson,* the defendant, a political leader in New Jersey, was charged with willfully attempting to defeat and evade his income taxes for the years 1935, 1936, and 1937. He had allegedly received large sums of money from those conducting the numbers game for protection against police interference and had not reported those sums in his income tax returns. On direct examination, the defendant admitted receiving weekly payments up to November, 1937. On cross-examination he denied receiving payments during November and December, 1937. He was then asked if he received any money in 1938. His attorney objected, the objection was overruled, and the defendant admitted he had. When asked about the source of the money, the defendant declined to answer, claiming his constitutional privilege against self-incrimination. On review, the supreme court upheld the propriety of the cross-examination:

"The case of an accused who voluntarily takes the stand and the case of an accused who refrains from testifying (*Bruno v. United States,* 308 U.S. 287) are of course vastly different. *Raffel v. United States,* 271 U.S. 494. His 'voluntary offer of testimony upon any fact is a waiver as to *all other relevant facts,* because of the necessary connection between all.' 8 Wigmore, Evidence

(3d ed., 1940) sec. 2276(2). And see *Fitzpatrick v. United States*, 178 U.S. 304, 315–316; *Powers v. United States*, 223 U.S. 303, 314. The cross-examination did not run afoul of the rule which prohibits inquiry into a collateral crime unconnected with the offense charged. *Boyd v. United States*, 142 U.S. 450. Inquiry into petitioner's income for 1938 was relevant to the issue in the case. As contended by the prosecution, the receipt of money from the numbers syndicate prior to November, 1937 and after December, 1937 might well support a finding of the jury that in view of all the circumstances the payments were not in fact interrupted during the last two months of 1937. The amount and source of the 1938 income accordingly were relevant to show the continuous nature of the transactions in question. That line of inquiry therefore satisfied the test of relevancy and was a proper part of cross-examination." (Emphasis in original.) 318 U.S. at 195–96.

A defendant's similar contentions were rejected in *Brown v. United States, supra.* "[A defendant] cannot reasonably claim that the Fifth Amendment gives him not only this choice [not to testify] but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute . . . . [The defendant] could not take the stand to testify in her own behalf and also claim the right to be free from cross-examination on matters raised by her own testimony on direct examination." 356 U.S. at 155–56.

In our view, the questions regarding the Wright and Lessard incidents concern matters reasonably related to the subject matter of the defendant's direct examination. In his testimony, the defendant attempted to portray himself as an innocent bystander to Winters' murder. He denied any knowledge of plans to kill Winters and asserted he had nothing to do with Winters' shooting death. He claimed his only involvement in the murder was his presence in the car when it occurred and testified the actual killers coerced his silence by threats against

his mother, his daughter, and the defendant himself. The questions put to the defendant during cross-examination challenged the accuracy of this depiction; the defendant's role in the Wright and Lessard incidents was inconsistent with the picture of innocent involvement in Winters' death which the defendant presented on direct examination. Moreover, the defendant's testimony also portrayed Haskins as bearing no ill will toward Winters and having no involvement in his death. The defendant's account of the Wright and Lessard incidents would be relevant to this aspect of his testimony in chief. The Wright and Lessard incidents "might be regarded as having some relevancy to the defendant's claim as to the innocent character of his [activity] at the time charged. It had a tendency to show that defendant knew the character of the [activity] in which he was then engaged." *Powers v. United States,* 223 U.S. 303, 316 (1912). The Wright and Lessard incidents surely are "circumstances connecting [the defendant] with the alleged crime." *Fitzpatrick v. United States,* 178 U.S. at 315. As such, the cross-examination of the defendant did not exceed the extent of his waiver of the privilege against self-incrimination. Because the state's cross-examination is clearly within the well-established scope of waiver, we need not address the issue whether cross-examination purely collateral to the subject matter of direct examination, permissible under the wide-open rule, is beyond the scope of the defendant's waiver.

Additionally, we conclude the defendant's contention, that he may not be subjected to cross-examination on issues not covered by his direct testimony, is unsupported by the rationale of the rule of waiver by testifying. The essential objective of our adversary system of justice is truth. This quest, however, is at times subordinated to higher values. Ordinarily, the privilege against self-incrimination preserves such a value.

"[P]rivileges . . . are designed to protect weighty and legitimate competing interests. Thus, the Fifth Amendment to the Constitution provides that no man 'shall be compelled in any criminal case to be a witness against himself.' . . . [This] and other interests are recognized in law by privileges against forced disclosure, established in the Constitution, by statute, or at common law. Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 709–10 (1974).

But where the defendant voluntarily takes the stand to offer his version of the facts, "the reasons advanced for the privilege . . . are decisively less persuasive," 8 Wigmore, *Evidence,* sec. 2276, 462 (McNaughton Rev. 1961); and "the interests of the [state] and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination." *Brown v. United States,* 356 U.S. at 156. "[U]nless prosecutors are allowed wide leeway in the scope of impeachment cross-examination some defendants would be able to frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge." *Doyle v. Ohio,* 426 U.S. 610, 617 n. 7 (1976). To allow a defendant to testify with impunity solely on matters he chooses and in the manner he chooses is a "positive invitation to mutilate the truth." *Brown v. United States,* 356 U.S. at 156. Accordingly, a defendant who testifies is deemed to have waived the privilege, at least with respect to matters reasonably related to the subject matter of his direct examination, and the state is entitled to subject his testimony to adverse cross-examination.

Here, the defendant sought to attain precisely what the waiver rule seeks to prohibit. His objective was to testify that he had no involvement in the death of Win-

ters, divorcing himself from Haskins' search for vengeance. The answers sought by the state would have stripped the defendant of this guise and revealed him to be an at-times, overzealous henchman of Haskins. The questions propounded during cross-examination concerned matters within the letter and the spirit of the waiver rule. We hold the trial court correctly ruled the defendant had no right to invoke the Fifth Amendment and avoid response.

### III.

The defendant next complains that subjecting him to cross-examination regarding the Wright and Lessard incidents places him in "an untenable situation," forced to choose between protecting his Fifth Amendment rights against self-incrimination regarding the charges pending in Milwaukee county which arose out of those incidents and appearing in a contemptuous manner before the jury at his murder trial in Kenosha county. This dilemma, he contends, "is so inherently unfair as to deny the defendant due process of law."

The defendant's argument assumes that testimony regarding the Wright and Lessard incidents elicited on cross-examination could be used against him in a subsequent trial on those charges. This assumption, of course, is correct. Except where the defendant is impelled to testify in order to meet evidence introduced against him in violation of his constitutional rights,[9] the general rule is that a defendant's testimony at another trial is admissible in evidence against him in later proceedings.[10]

[9] *Harrison v. United States,* 392 U.S. 219, 222–26 (1968).

[10] *See, e.g.: United States v. Bohle,* 475 F.2d 872, 875 (2d Cir. 1973); *United States v. Anderson,* 481 F.2d 685, 696 (4th Cir. 1973); *United States v. Nell,* 570 F.2d 1251, 1259–60 (5th Cir. 1978); *State v. Robinson,* 202 Neb. 210, 274 N.W.2d 553, 556

"Once the privilege [against self-incrimination] is effectively waived, the information given is admissible at any subsequent trial." *United States v. Houp,* 462 F.2d 1338, 1340 (8th Cir. 1972), *cert denied* 409 U.S. 1011. The rule is apparently accepted by the United States Supreme Court: "[W]e . . . do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives." *Harrison v. United States,* 392 U.S. 219, 222 (1968) (footnote omitted).

We also recognize the difficulties attached to the defendant's decision not to answer relevant inquiries having once testified. Because the defendant had no right to invoke the privilege against self-incrimination when questioned about the Wright and Lessard incidents, the trial court did not err in requiring the defendant to invoke his privilege in the presence of the jury,[11] in permitting the district attorney to comment on *that* silence in his closing argument,[12] and in instructing the jury that the defendant's refusal to answer could be considered in assessing his credibility.[13]

(1979); *State v. Williams,* 115 N.H. 437, 343 A.2d 29, 31 (1975); *State v. Fleming,* 33 N.C. App. 216, 234 S.E.2d 431, 433 (1977); *State v. Slone,* 45 Ohio App.2d 24, 340 N.E.2d 413, 415 (1975); *State v. Alexander,* 10 Wash. App. 942, 521 P.2d 57, 58–59 (1974); 8 Wigmore, *supra,* sec. 2276(5), 472–73.

[11] *United States v. Beechum,* 582 F.2d 898, 909 (5th Cir. 1978) (en banc); *United States v. Hearst,* 563 F.2d 1331, 1341–43 (9th Cir. 1977).

[12] *Fitzpatrick v. United States,* 178 U.S. 304, 315–16 (1900); *Carpenter v. United States,* 264 F.2d 565, 569–70 (4th Cir. 1959); *United States v. Beechum,* 582 F.2d at 909.

[13] *Caminetti v. United States,* 242 U.S. 470, 493–95 (1917); *United States v. Weber,* 437 F.2d 327, 334 (3d Cir. 1970), *cert. denied* 402 U.S. 932 (1971); *United States v. Brannon,* 546 F.2d 1242, 1247 (5th Cir. 1977).

But the defendant is not put to a choice between these hard alternatives unless he first volunteers to testify. As a criminal defendant, he has an absolute right not to testify; adverse comment on such a proper invocation of the privilege against self-incrimination is prohibited. *Griffin v. California,* 380 U.S. 609, 613–15 (1965). While the defendant obviously has an interest in defending against the state's accusations by testifying on his own behalf, neither the choice to testify nor the choice of alternatives defendant must make once he waives his privilege by testifying can be said to be unconstitutionally imposed on him.

"The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow. *McMann v. Richardson,* 397 U.S., at 769. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose." *McGautha v. California,* 402 U.S at 213.

Certainly, the choice between not testifying and effecting a partial waiver of his privilege by testifying is not unconstitutionally required. This was expressly recognized in *McGautha.*

"It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination. See, *e.g., Brown v. Walker,* 161 U.S. 591, 597–598 (1896); *Fitzpatrick v. United States,* 178 U.S. 304, 314–316 (1900); *Brown v. United States,* 356 U.S. 148 (1958). It is not thought overly harsh in such situations to require that the determination whether to waive the privilege take into account the matters which may be brought out on cross-examination. It is also generally recognized that a defendant who takes the stand in his own behalf may be impeached by proof of prior convictions or the like. See *Spencer v. Texas,* 385 U.S., at 561;

cf. *Michelson v. United States,* 335 U.S. 469 (1948); but cf. *Luck v. United States,* 121 U.S. App. D.C. 151, 348 F.2d 763 (1965); *United States v. Palumbo,* 401 F.2d 270 (CA 2 1968). Again, it is not thought inconsistent with the enlightened administration of criminal justice to require the defendant to weigh such pros and cons in deciding whether to testify." 402 U.S. at 215.

By the same token, an intolerable burden is not placed on the defendant's decision whether to testify by the knowledge that wrongful invocation of the privilege against self-incrimination can be subject to adverse comment. We conclude the defendant's contention is utterly without merit.

The court of appeals sought to deliver the defendant from his dilemma by creating a use immunity, precluding use of a defendant's statements on cross-examination in subsequent proceedings. *Neely v. State,* 86 Wis.2d at 325–331. In our view, this action is unsupportable and clearly incorrect. The central flaw in the court of appeals' reasoning is its misconception of the extent of waiver by testifying. As that court correctly stated, "[t]he defendant has not necessarily waived his right [against compelled self-incrimination] in the second trial by taking the stand and subjecting himself to cross-examination in the first trial." *Id.* at 326. However, this means only that the defendant cannot be compelled to testify at the second trial by his voluntary offer of testimony at the first. As discussed above (*supra,* pp. 51, 52), "his voluntary testimony on the former occasion may *itself be used* . . . on the subsequent occasion." 8 Wigmore, *supra,* sec. 2276(4), 472 n. 5 (emphasis in original). Once a defendant waives his privilege by voluntarily testifying, his privilege "disappears completely" as to the answers he gives, *id., sec.* 2276(5), 472–73; and his answers may be used in subsequent proceedings. Because the defendant, by taking the stand, waives his privilege against self-incrimination as to the testimony

he gives, use immunity is unnecessary and inappropriate. Nothing in the Federal or Wisconsin Constitutions requires a contrary conclusion. To the extent the court of appeals' opinion differs in any respect from this opinion, it is expressly disapproved.

Because we find the court of appeals' creation of a use immunity to be incorrect, it is unnecessary to address the defendant's claim that the court of appeals erred in denying him use immunity on a theory of tactical waiver.

## IV.

We next consider additional grounds which the defendant urges in support of the contention that his conviction must be reversed and a new trial ordered.

In related arguments, the defendant asserts that Lessard's testimony should have been excluded as improper rebuttal and that the testimony of both Wright and Lessard should have been excluded as having prejudicial effect which outweighed their testimony's probative value. We have reviewed the written and oral arguments of the parties, and we conclude the testimony was properly admitted for the reasons expressed in the opinion of the court of appeals. *See: Neely v. State,* 86 Wis.2d at 310–14.

The defendant also contends the prosecutor's reference to his failure to tell his story before trial constitutes prejudicial error and that he was denied due process of law and a unanimous jury verdict by virtue of the fact that the trial court gave a disjunctive jury instruction on the party to a crime issue. We conclude these claims have been waived. With regard to the prosecutor's comments, the defense counsel objected to the comment, and the trial court sustained the objection. However, no motion for mistrial was made, nor was a special instruction requested. As the court of appeals noted, "[w]ithout these

requests, all we can assume is that the defendant was satisfied with the court's ruling and curative measure, and that he had no further objections. The defendant took his chances with the jury, curative instruction and all." *Id.* at 319. While the alleged error may be scrutinized to determine whether it amounts to plain error affecting substantial rights, this court's power to do so is discretionary and should be sparingly exercised. *Virgil v. State,* 84 Wis.2d 166, 195, 267 N.W.2d 852 (1978) (Beilfuss, C.J., concurring) ; *id.* at 199 (Hansen, Hanley, and Callow, JJ., dissenting). We decline to do so here. The defendant's argument questioning the propriety of the party to a crime jury instruction is deemed waived because of the defendant's failure to object to the challenged instruction at the time of trial, *Larson v. State,* 86 Wis.2d 187, 196, 271 N.W.2d 647 (1978) ; because of his failure to raise the issue in his post-trial motion for a new trial, *Thiesen v. State,* 86 Wis.2d 562, 564, 273 N.W.2d 314 (1979) ; and because of his failure to present the issue to the court of appeals, *State v. Killory,* 73 Wis. 2d 400, 409–10, 243 N.W.2d 475 (1976).

Finally, the defendant argues he should be given a new trial in the interests of justice. We believe the evidence is sufficient to dispel any doubt regarding the defendant's guilt; we do not believe a new trial would produce a different result. Accordingly, we decline to exercise our discretionary power and grant the defendant a new trial. *McAdoo v. State,* 65 Wis.2d 596, 612, 223 N.W.2d 521 (1974) ; *Garrella v. State,* 61 Wis.2d 351, 354, 212 N.W.2d 101 (1973).

*By the Court.*—Decision affirmed.