COURT OF APPEALS
DECISION
DATED AND FILED

May 8, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1139-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF395

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

AZURE S. MURRAY,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Walworth County: PHILLIP A. KOSS, Judge. *Affirmed*.

Before Gundrum, P.J., Grogan and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   Azure S. Murray appeals a judgment of conviction for robbery of a financial institution as a party to a crime, as well as an order denying her postconviction motion for a new trial.   The jury concluded Murray was criminally liable for acting as the driver in a bank robbery perpetrated by Michael Brown.   Murray argues her trial counsel was constitutionally ineffective for misadvising her about the possibility that the State would cross-examine her about a charged offense in another county if she testified.   She also argues she received ineffective assistance of counsel as a result of her attorney's failure to impeach Brown with the details of his criminal record and with the contents of recorded jail telephone calls.   Finally, Murray contends newly discovered evidence—namely, the jail phone calls—warrants a new trial.   We reject Murray's arguments and affirm.

## BACKGROUND

¶2      On June 19, 2018, at approximately 2:00 p.m., a man robbed the East Troy branch of Associated Bank.   That man was undisputedly Michael Brown.   Brown, who had a lengthy criminal history, was granted use immunity and testified on behalf of the State against Murray at her trial for her participation as a party to a crime.

¶3      Specifically, Brown testified that Murray acted as the driver because she needed money to pay off some drug dealers.   Though Brown was evasive when answering questions about who had formulated the robbery plan, he ultimately testified that Murray had shown him the location of the bank the day before the robbery.   He added that she planned to enter the bank herself until Brown suggested that he do it.

¶4      Immediately upon the commencement of cross-examination, Brown was asked by defense counsel how many criminal convictions he had. The parties had earlier stipulated that Brown had nine. Brown responded that he did not know which offenses counsel was talking about. Thus began a back-and-forth between Brown and defense counsel wherein Brown variously responded that he "[hadn't] been able to count" all his convictions, that he had a "very minor" record, and that he had "[a]pparently" been convicted in connection with this bank robbery. Defense counsel terminated this line of questioning by getting Brown to affirmatively admit that had been convicted of robbing the East Troy branch.

¶5      The State had other evidence of Murray's involvement besides Brown's testimony. Two witnesses saw a female in and around the suspected getaway vehicle in the minutes surrounding the robbery; one of them identified Murray at trial as the driver. The identifying witness also testified that Murray was transporting a male passenger, who left while Murray feigned car troubles. A few minutes later, the male came running back to the car, he jumped in the back seat and lay down, and the pair "took off" in the vehicle.

¶6      Jacqueline Brown, Michael Brown's mother, testified that Murray and Michael[1] were living together at her residence in the months leading up to the robbery. Jacqueline also testified that at the time the robbery occurred, Michael and Murray were absent from the residence and were using the suspected vehicle (which belonged to Jacqueline's aunt). The pair returned around 3:00 p.m. and hurriedly left in separate vehicles, with Murray driving the suspected robbery

---

[1] References to Michael Brown will appear as both "Michael" and "Brown" in this opinion. Jacqueline Brown will be referred to by her first name.

vehicle. Jacqueline never saw it again. Michael and Murray left the residence after that and did not return. Jacqueline testified she met with them twice at different locations while they were on the run from law enforcement.

¶7      Murray elected not to testify at trial, and a jury convicted her of the robbery as a party to a crime.

¶8      After sentencing, Murray filed a postconviction motion seeking a new trial. As relevant here, Murray argued her trial attorney had incorrectly counseled her that, if she testified, she could be impeached with evidence of her involvement as the driver in an alleged Waukesha County burglary that occurred several months before the East Troy robbery. Murray alleged that her attorney failed to advise her that she could invoke her Fifth Amendment right against self-incrimination and refuse to answer questions about the events in Waukesha County.

¶9      The postconviction motion also alleged that Murray's trial counsel was constitutionally ineffective for failing to more thoroughly impeach Brown, including by eliciting testimony detailing his criminal history, his attempted escape from custody,[2] and contents of certain telephone calls Brown made while in jail. In the first set of recorded phone calls, made shortly after Brown was apprehended, he called Murray disparaging names and suggested that Murray could be useful to him because she had not yet made a statement to police. In the second set of phone calls, made during the trial, Brown appeared to admit he had perjured himself at trial when he feigned ignorance about meeting his mother after

---

[2] Brown had apparently tried to flee from a squad car traveling on the interstate after he was arrested in connection with the robbery.

the robbery. Murray also argued that the calls constituted newly discovered evidence.

¶10 The circuit court denied the motion for a new trial following a *Machner*[3] hearing.[4] First, the court concluded there was a significant possibility that it would have permitted Murray to be cross-examined using the Waukesha County case, either as a specific instance of untruthfulness or on other-acts grounds. As a result, the court determined that trial counsel's advice that Murray could be impeached with those events was not deficient performance.

¶11 The court also concluded Murray's trial counsel was not deficient in his cross-examination of Brown. The court found that Brown was a combative witness who portrayed himself as being unjustly persecuted because he had tried to help Murray. It remarked that "[y]ou couldn't put it into words, without being there, how bad of a witness Mr. Brown was." The court determined trial counsel's cross-examination was effective because it established that Brown was not somebody to be liked or trusted without permitting Brown to derail the proceedings with his confrontational and evasive responses.

¶12 Additionally, the circuit court rejected the specific allegations of ineffective assistance regarding Brown's cross-examination. The court viewed further exploration of Brown's prior convictions as fruitless, noting that Brown "probably wouldn't have conceded" the fact or nature of the prior convictions,

---

[3] *See* **State v. Machner**, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[4] Murray did prevail in part on her postconviction motion; based on the State's concession, the circuit court concluded Murray received ineffective assistance of counsel at sentencing, where successor counsel (i.e., not her trial attorney) made an appearance on her behalf while intoxicated.

requiring defense counsel to belabor the trial with more arguing. Nor did the court conclude the facts of Brown's escape attempt would have materially aided Murray's defense. Finally, the court rejected Murray's ineffective assistance claim based on Brown's jail telephone calls, finding that Murray had not established prejudice arising from counsel's failure to obtain the first set of recordings and that her counsel's failure to obtain the second set of recordings during trial was not deficient performance.

¶13 The circuit court also rejected Murray's newly discovered evidence claim. It first found the evidence of Brown's perjury and witness tampering was cumulative, as there was "no hiding Mr. Brown's character." For the same reason, the court determined there was no reasonable probability of a different result had the evidence come in at trial. Murray now appeals.

## DISCUSSION

¶14 On appeal, Murray renews her argument that she is entitled to a new trial because she received constitutionally ineffective assistance and by virtue of newly discovered evidence. For the reasons set forth below, we reject her ineffective assistance of counsel claims because her trial counsel did not perform deficiently in any of the ways Murray alleges. We also conclude her newly discovered evidence claim fails because Murray has not established a reasonable probability that she would have been acquitted had the evidence been admitted at trial.

### I. Ineffective Assistance of Counsel

¶15 The Sixth Amendment guarantees a defendant the effective assistance of counsel. *State v. Savage*, 2020 WI 93, ¶27, 395 Wis. 2d 1, 951

N.W.2d 838. To prevail on an ineffective assistance claim, the defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. *Id.*, ¶25; *see also **Strickland v. Washington***, 466 U.S. 668, 687 (1984). If the defendant fails to establish either prong, we need not address the other. *Savage*, 395 Wis. 2d 1, ¶25.

¶16     To demonstrate deficient performance, the defendant must show that his or her attorney made errors so serious that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.*, ¶28. We presume that counsel's conduct fell within the wide range of reasonable professional assistance, and we will grant relief only upon a showing that counsel's performance was objectively unreasonable under the circumstances. *Id.* Prejudice is demonstrated by showing a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Id.*, ¶32.

¶17     We review an ineffective assistance of counsel claim using a mixed standard of review. *Id.*, ¶25. The circuit court's factual findings, including those regarding trial counsel's conduct and strategy, will not be overturned unless they are clearly erroneous, but we review de novo whether counsel's conduct constitutes constitutionally ineffective assistance. *Id.*

A. *Murray's Fifth Amendment Right to Silence*

¶18     Murray first argues she was misadvised concerning her decision whether to testify at her trial. She asserts trial counsel failed to inform her that she could not be cross-examined with the details of her pending charge in Waukesha County. Murray asserts that had she been correctly advised, she would have testified she did not know that Brown planned to rob the bank when she drove him

7

to the area, and she would have invoked her Fifth Amendment right against self-incrimination when asked about the Waukesha County case.

¶19    "It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." *Mitchell v. United States*, 526 U.S. 314, 321 (1999).  The Fifth Amendment privilege is waived as to matters about which the witness testifies, and the scope of the waiver is coterminous with "the scope of relevant cross-examination." *Id.*; *see also Neely v. State*, 97 Wis. 2d 38, 47, 292 N.W.2d 859 (1980) (holding that a witness may be compelled to answer on matters reasonably related to the subject matter of the direct examination).

¶20    At the heart of this issue is the parties' disagreement about whether the alleged Waukesha County offense was "reasonably related to the subject matter" of direct examination—that is, the matter of Murray's involvement in the East Troy robbery.  The parties reach vastly different interpretations of *Neely* in this regard.  Murray argues that—unlike her case—*Neely* did not really involve cross-examination regarding a collateral matter, given that the events the state desired to use "tended to show the defendant's motive" for a subsequent homicide. *Neely*, 97 Wis. 2d at 42-43.  The State, by contrast, argues the events that formed the basis for the cross-examination in *Neely* were wholly separate incidents from the homicide, and therefore *Neely*'s holding regarding the scope of the Fifth Amendment waiver controls and permitted the use of the alleged Waukesha County events here.

¶21    *Neely* quoted extensively from *Johnson v. United States*, 318 U.S. 189 (1943).  Though neither party discusses *Johnson*, that case appears to

8

establish that collateral conduct—i.e., conduct for which the accused is not on trial—may be relevant to a prosecution such that the Fifth Amendment protections regarding that conduct are waived by the defendant's decision to testify at trial. *See id.* at 195 (holding that the defendant's receipt of illicit income in 1938 was relevant for purposes of the Fifth Amendment waiver in a tax prosecution for the three preceding years).

¶22    ***Mitchell*** and ***Johnson*** provide a substantial legal basis for the advice trial counsel provided to Murray. After all, relevant cross-examination in Wisconsin can include questioning about other acts evidence pursuant to WIS. STAT. § 904.04 (2021-22).[5] Such evidence is admissible if it is: (1) offered for an acceptable purpose; (2) relevant; and (3) has probative value that is not substantially outweighed by various trial considerations. ***State v. Sullivan***, 216 Wis. 2d 768, 772-73, 576 N.W.2d 30 (1998).

¶23    During postconviction proceedings, the circuit court determined that it would have permitted the State's anticipated cross-examination as valid other-acts evidence to demonstrate Murray's intent and counter her claim of mistake. We need not directly consider whether such a holding would have constituted an erroneous exercise of discretion—particularly since Murray does not make such an argument. Rather, the critical point for our purposes is this: there was a significant likelihood that Murray would have been validly

---

[5] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

subject to cross-examination on the matter of the alleged Waukesha County offense, which is exactly what Murray's counsel told her.[6]

¶24    Murray appears to rely on *Boyd v. United States*, 142 U.S. 450 (1892), which was cited in passing in *Johnson* for the proposition that "inquiry into a collateral crime unconnected with the offense charged" is prohibited. *Johnson*, 318 U.S. at 195. But *Boyd* was not a self-incrimination case. Instead, in *Boyd* the Supreme Court was concerned that the defendant was convicted of murder based on evidence that he was involved in a series of robberies that had nothing to do with the death. *Boyd*, 142 U.S. at 458. In this sense, *Boyd* does little more than echo Wisconsin's general prohibition on propensity evidence—a prohibition the State could arguably have dodged, as set forth in the circuit court's postconviction decision.

¶25    For the foregoing reasons, we conclude Murray has failed to demonstrate that her trial counsel was constitutionally ineffective by advising her that if she testified at trial, she could be impeached with questioning related to the alleged Waukesha County offense.

### B. Brown's Cross-Examination

¶26    Murray also argues her trial counsel was constitutionally ineffective during Brown's cross-examination. She contends that her attorney should have

---

[6] Beyond that, *Neely v. State*, 97 Wis. 2d 38, 292 N.W.2d 859 (1980), explicitly declined to reach the issue of "whether a defendant who takes the stand waives his privilege to the full scope of cross-examination permissible under Wisconsin's evidentiary rules," contrasted with the narrow scope of cross-examination allowed in federal courts. *Id.* at 44-45. Accordingly, Murray has not established that the scope of the Fifth Amendment waiver is sufficiently settled such that her attorney had a duty to advise her that she could not be questioned about the Waukesha County case. *See State v. Breitzman*, 2017 WI 100, ¶49, 378 Wis. 2d 431, 904 N.W.2d 93.

engaged in detailed questioning regarding Brown's prior convictions and his attempted escape from custody. She also argues her attorney should have impeached Brown by using the jail telephone call recordings. Among other things, Murray asserts that such questioning would have irreparably damaged Brown's credibility by showing he committed perjury, as well as by "demonstrate[ing] to the jury that Brown was indeed controlling and manipulative, that Brown was either lying about or embellishing the supposed motive for the crime, and that Brown's supposed concern for Murray was a ruse."

¶27    Murray has failed to establish deficient performance related to the failure to more thoroughly cross-examine Brown regarding his criminal history and his escape attempt. Her trial counsel was aware of both matters.[7] Consistent with the circuit court's findings, counsel testified that Brown came off as evasive and manipulative in his testimony. Counsel believed he had achieved his goal of showing Brown's negative qualities, specifically by getting Brown to admit that he had been convicted of the East Troy robbery, in which Brown had concealed his face and terrorized the female bank employees. Under the circumstances, we conclude this was reasonable trial strategy; at a minimum, it does not constitute an error "so serious that counsel was not functioning as the 'counsel' guaranteed … by the Sixth Amendment." *See **Strickland***, 466 U.S. at 687.

¶28    We further conclude Murray's trial counsel did not perform deficiently by failing to obtain the recorded jail telephone calls. As an initial

---

[7] Trial counsel also testified that he was under the impression from the circuit court's prior rulings and statements that delving into these matters would not be allowed. Because we conclude trial counsel's alternative rationale for not pursuing further questioning was reasonable trial strategy, we need not further address counsel's belief in that respect.

11

matter, Murray's brief appears to address deficient performance only as it pertains to the calls made in July 2018, soon after Brown was apprehended. Although counsel was generally aware that the jail recorded inmate calls, counsel testified he had no reason to suspect that any of Brown's telephone calls would yield information relevant to Murray's prosecution.

¶29 Importantly, we afford trial counsel's representation the presumption of constitutional adequacy. *State v. Breitzman*, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93. Though Brown's credibility was an important issue in the case, Murray does not allege that her trial counsel failed to undertake any independent investigation of the State's key witness. *See State v. Thiel*, 2003 WI 111, ¶50, 264 Wis. 2d 571, 665 N.W.2d 305. Rather, Murray contends it was deficient performance not to specifically seek out one particular piece of possible evidence: jail telephone recordings. Implicitly, Murray considers it imperative that her trial attorney should have taken the time to file an open records request and then listen to any and all of the disclosed recordings to ascertain whether there was something that might have aided her defense.

¶30 We are unpersuaded that *Strickland* requires an attorney to engage in such a needle-in-a-haystack endeavor, particularly given that there were many avenues trial counsel could have used to impeach Brown. Murray's trial counsel acknowledged during his *Machner* hearing testimony that it was always possible different lines of investigation would yield relevant information, but he noted that there is "only so much time in a day." Counsel testified that the time necessary to obtain, review, and design a theory of admissibility for telephone calls was time that would be unavailable to otherwise prepare Murray's case. In our view, our obligations to avoid the "distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

counsel's perspective at the time" requires us to reject Murray's claim.[8] *See Strickland*, 466 U.S. at 689.

## II. Newly Discovered Evidence

¶31 Murray also argues the jail telephone calls constitute newly discovered evidence warranting a new trial. To set aside a judgment of conviction, the newly discovered evidence must demonstrate that a manifest injustice occurred. *State v. Watkins*, 2021 WI App 37, ¶42, 398 Wis. 2d 558, 961 N.W.2d 884. A defendant must first establish that the evidence qualifies as newly discovered evidence; then, the circuit court must determine whether there is a reasonable probability of a different result—that is, whether the jury would have had a reasonable doubt about the defendant's guilt if it had heard the evidence. *Id.* We review the circuit court's decision on a newly discovered evidence claim for an erroneous exercise of discretion. *Id.*, ¶44. However, whether a reasonable probability of a different trial result exists is reviewed de novo. *Id.*

¶32 Even assuming the telephone calls otherwise met the four-part test for newly discovered evidence, the evidence would not have created a reasonable probability of a different outcome. *See id.*, ¶43. Brown was a questionable prosecution witness who, despite directly committing the robbery, continually downplayed his own involvement and complained of being treated unfairly by the justice system. Among his more absurd testimony was his differentiating between "terrifying" and "scaring" the bank tellers—he acknowledged doing the latter but

---

[8] Even if Murray's trial counsel's performance could be characterized as deficient for failing to obtain the July 2018 recordings, we would alternatively conclude she has failed to establish prejudice given their contents and the trial record.

resisted the former characterization—and his claim that he had been "pretty polite" during the robbery. Despite his evasive answers, it was clear Brown had a considerable criminal history. He also acknowledged that he had used multiple fake identities to avoid apprehension and that, once arrested, he had attempted to bargain his way out of trouble.

¶33 In short, there was ample evidence that cast doubt on Brown's veracity. Even without the recordings, it was likely the jury had a negative impression of Brown and regarded as nonsense his denials of meeting his mother and his claim that he was motivated by a genuine concern for Murray's well-being. In this respect, we emphasize the circuit court's repeated observations that Brown's credibility was impugned by his own conduct during the trial. Moreover, because Jacqueline testified that Murray was with Brown during the post-robbery meetings, bolstering Jacqueline's credibility would not necessarily have aided Murray's trial defense, insofar as it would have cast doubt on the defense's attempts to distance Murray from Brown and to emphasize her lack of knowledge about Brown's plan to commit a robbery.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.