STATE of Wisconsin, Plaintiff-Respondent,

v.

Ernest J. KING, Defendant-Appellant.

Court of Appeals

*No. 95–3442–CR. Submitted on briefs July 12, 1996.—Decided September 30, 1996.*

(Also reported in 555 N.W.2d 189.)

For the defendant-appellant the cause was submitted on the briefs of *Steven D. Phillips*, assistant state public defender.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Paul Lundsten*, assistant attorney general.

Before Eich, C.J., Dykman, P.J., and Vergeront, J.

DYKMAN, P.J.   Ernest J. King appeals from a judgment convicting him of armed robbery while concealing his identity in violation of §§ 943.32 and 939.641, STATS., and an order denying his motion for a new trial. Desiree Henry, who was Ronald Vales' girlfriend, told the police that Vales told her "me and Jerome robbed a bank" and that Jerome took part of the proceeds. Henry later identified King as "Jerome." At Vales' and King's joint trial, the jury heard several references to these statements. King never objected to the admission of these statements.

King argues that: (1) it was plain error for the State to have elicited Vales' extrajudicial statements at trial; (2) he was denied effective assistance of counsel when his attorney did not move for severance or object to the introduction of Vales' statements; and (3) the State's failure to advise the court prior to trial of its

intention to introduce Vales' statements deprived him of his statutory right to compulsory severance. We conclude that any error made at trial was harmless, and therefore affirm.

## BACKGROUND

On October 7, 1993, two men robbed the Municipal Credit Union in Beloit. On October 30, 1993, Desiree Henry informed the police that Vales and King had told her they had robbed the credit union. On November 9, 1993, Henry gave a written statement to Detective Craig Johnson, and on November 11, 1993, Henry again talked to Johnson and Detective Victor Hanson.

At some point during these three interviews, Henry stated that on the morning of the robbery, Vales left her residence at about 7:30 or 8:00 a.m. in her car. Vales took his blue and white jacket with him and returned at 9:30 or 10:00 a.m. with King. When Vales and King arrived, they went into Henry's bedroom and closed the door, at which time King changed into different clothes provided by Vales. Henry called for a cab to pick up King and take him to "Liberty and Bluff," and the cab came immediately. Henry stated that King, whose pockets were bulging with "bundles," talked about getting a new stereo for his car.

Henry entered her bedroom after King left and saw a pillowcase with a light-colored pastel design laying on her bed. When Henry gave Vales two portions of a nylon pantyhose that she found laying on the back floor of her car, he put them into the pillowcase along with a black BB gun pistol. Vales left with the pillowcase and returned without it.

Vales and Henry later took Henry's car to Midas Muffler for brake repairs. Vales gave Henry either $339 or $359 in cash to pay for the repair, and Henry

picked up the car at about 2:00 or 3:00 p.m. When Henry returned with the car, Vales told her: "I am going to tell you straight up, me and Jerome robbed a bank." Vales also told Henry that King took some of the money.

The State charged King and Vales with robbing the credit union. On December 1, 1993, Henry testified at King's preliminary hearing and reiterated many of the statements that she had given to the police. At Vales' preliminary hearing in February 1994, however, Henry recanted her accusations against Vales and King.

Both King and Vales were bound over for trial. On March 29, 1994, the State moved to join the two cases for trial, stating that it would not introduce evidence against either defendant at trial that would be inadmissible or prejudicial to the other defendant. The court granted the State's joinder motion, and the trial began on May 25, 1994.

At trial, the State called five credit union employees and one customer to testify. One teller testified that the credit union was robbed around 10:00 a.m., and the robbery was called into the police at 10:21 a.m. Several eyewitnesses testified that the robbers were black males around six feet tall and wore black nylon stockings over their heads. Some witnesses also testified that one of the robbers wore a white and blue windbreaker and carried a handgun. One teller also observed one of the robbers put something into a white pillowcase with pastel flowers on it.

The State also called Henry as a witness. Much of Henry's testimony was contrary to her prior statements contained in the reports of Detectives Hanson and Johnson and contained in the transcript of King's preliminary hearing. Henry testified that she was

asleep when Vales left her house, apparently borrowing her car. Vales and King returned to her house at about 9:30 a.m. and went into the bedroom for about a half hour. King asked Henry to call a cab, which arrived in about forty-five minutes. Henry found cut-up nylon pantyhose in her car, but did not believe that the pantyhose was big enough to fit over a person's face. Henry did testify that later that day, Vales gave her $349 cash to pay Midas to have her front brakes repaired.

Henry claimed that either she did not recall making or did not make the prior statements inconsistent with her testimony. She denied that Vales told her either that he and King robbed the credit union or that King took some of the money. She also denied seeing Vales with a gun or pillowcase on the day of the robbery.

The prosecutor impeached much of Henry's trial testimony with contradictory statements she made to Detectives Hanson and Johnson and with contradictory testimony she had given at King's preliminary hearing. The State also called several witnesses who corroborated the statements Henry gave to police. John Fahrey of the Beloit Police Department testified that a blue and white windbreaker and a black nylon mask were recovered from a field about 150 yards from the credit union, which is three to four miles from Henry's house. The cab driver who responded to Henry's residence on October 7, 1993, testified that the call came in at 10:42 a.m. and that he responded within ten minutes. He was told the passenger wanted to go to "Bluff and Liberty." An employee of a car stereo shop testified that he was paid $375 cash for installing a cassette player and amplifier in a car for "Thomas King" on October 7, 1993. He identified Ernest King as the man

who claimed to be "Thomas King." Finally, an employee of Midas Muffler testified that he did an estimate for Henry's car on October 7, 1993, at 11:17 a.m. and was paid $339.99 cash for the repairs.

The jury heard reference to Vales' statements incriminating King during the prosecution's opening remarks, during the prosecution's questioning of Henry, Hanson, Johnson and Fearn, during the defense's questioning of Henry and Fearn, and during the prosecution's closing and rebuttal arguments. King did not object to either the prosecution's questions eliciting this testimony or the prosecution's repetition of Vales' statements in speaking to the jury.

The jury found King guilty of armed robbery while concealing his identity. King filed a motion for a new trial, raising the same issues that are raised in this appeal, which the trial court denied. King appeals.

## PLAIN ERROR

King argues that the admission of Vales' incriminating statements is plain error. By failing to object to this testimony, King did not preserve the asserted error for appeal, and we need not consider unpreserved arguments. *State v. Wolff*, 171 Wis. 2d 161, 165, 491 N.W.2d 498, 500 (Ct. App. 1992). However, § 901.03(4), STATS., provides: "Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the judge."

King bases his argument that we should reverse his conviction on *Virgil v. State*, 84 Wis. 2d 166, 267 N.W.2d 852 (1978). In *Virgil*, the prosecution introduced a nontestifying codefendant's confession, which implicated Virgil, and Virgil did not object to the admission of the confession. *Id.* at 184, 267 N.W.2d at

861. The supreme court reversed Virgil's conviction under the plain error doctrine, even though the state "produced convincing evidence of Virgil's guilt." *Id.* at 184, 267 N.W.2d at 861-62. The court could not say "beyond a reasonable doubt that the [codefendant's confession] . . . did not play a part in impelling the jury's verdict." *Id.* at 192, 267 N.W.2d at 865. The court continued:

> Moreover, the defendant's conviction was obtained through a violation of his confrontation rights under the United States and Wisconsin Constitutions. This violation of the defendant's constitutional rights is so serious, viewed in the context of the other evidence properly admitted in this case, that we conclude that the admission of the evidence constitutes plain error, requiring a reversal of the conviction.

*Id.*

We decline King's invitation to reverse his conviction based on *Virgil*. First, the opinion in *Virgil* was a plurality opinion, not a majority opinion. Chief Justice Beilfuss concurred, and Justices Hansen, Hanley and Callow dissented. The concurrence did not follow the plurality's analysis, however. While the plurality ordered a new trial in part because the admission of the confession violated Virgil's confrontation rights, the concurrence thought that a new trial should be ordered because "the defendant did not receive a fair trial." *Id.* at 194, 267 N.W.2d at 866 (Beilfuss, C.J., concurring). "It is a general principle of appellate practice that a majority must have agreed on a particular point for it to be considered the opinion of the court." *State v. Dowe*, 120 Wis. 2d 192, 194, 352 N.W.2d 660, 662

88

(1984).[1] Because a majority of the *Virgil* court did not agree on the standard for reversing a conviction under the plain error doctrine, the rules enunciated in the plurality opinion are not the opinion of the court.

Second, the facts in this case are distinguishable from the facts in *Virgil*. In *Virgil*, the court concluded:

> [O]ther than the evidence implicating the 'defendant contained in the [codefendant's confession], the only evidence connecting the defendant with the crime came from David Guyton, one of the other participants in the crime, who was impeached by the state on the alleged ground that he had given inconsistent statements and whose credibility was additionally subject to question because he had been granted complete immunity in exchange for his agreement to testify against Virgil.

*Virgil*, 84 Wis. 2d at 191-92, 267 N.W.2d at 865. As in *Virgil*, Henry was impeached because she had given prior inconsistent statements. Unlike *Virgil*, however, the impeached testimony was not the only basis for King's guilt. Rather, King was implicated in the crime by Henry's prior statements to police, by testimony and evidence that corroborated Henry's prior statements to police, and by other circumstantial evidence. *Virgil* is distinguishable.

---

[1] A majority of the *Virgil* court appears to agree on only two points. First, unlike § 751.06, STATS., the plain error rule does not require a probable different result on retrial for reversal. *See Virgil v. State*, 84 Wis. 2d 166, 189 n.2, 267 N.W.2d 852, 864 (1978); *id.* at 194, 267 N.W.2d at 866 (Beilfuss, C.J., concurring). Second, the court's decision to invoke the plain error rule is discretionary and should be exercised sparingly. *See id.* at 195, 267 N.W.2d at 866 (Beilfuss, C.J., concurring); *id.* at 199, 267 N.W.2d at 868 (Hansen, J., dissenting).

Some of the language contained in the *Virgil* plurality was adopted by the supreme court in *State v. Sonnenberg*, 117 Wis. 2d 159, 176-77, 344 N.W.2d 95, 103-04 (1984), and therefore has been established as precedential. In *Virgil*, 84 Wis. 2d at 191, 267 N.W.2d at 865, the court relied upon 3 WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 851 (1969), in stating:

> [I]t is said that "plain error" means "error both obvious and substantial," or "serious and manifest errors," or "seriously prejudicial error," or "grave errors which seriously affect substantial rights of the accused." Perhaps these attempts to define "plain error" do not harm, but it is doubtful whether they are of much help. . . . Indeed the cases give the distinct impression that "plain error" is a concept appellate courts find impossible to define, save that they know it when they see it.

Much of this language was adopted by *Sonnenberg*. King argues that because the admission of Vales' statements was both obvious and substantial, we should invoke the plain error doctrine. However, we agree with Wright's conclusion that it is doubtful whether these definitions are of much help, and we fail to see how "we'll know it when we see it" is an articulable standard for deciding when to invoke the plain error doctrine. Indeed, one Wisconsin Supreme Court justice has characterized plain error as "an area of law that continues to create confusion." *See State v. Gustafson*, 119 Wis. 2d 676, 700, 350 N.W.2d 653, 665 (1984) (Abrahamson, J., concurring), *rev'd on other ground per curiam*, 121 Wis. 2d 459, 359 N.W.2d 920, *cert. denied*, 471 U.S. 1056 (1985).

■

We conclude that Chief Justice Beilfuss's concurring opinion in *Virgil*, which was also adopted in *Sonnenberg*, presents a more articulable standard. *See Sonnenberg*, 117 Wis. 2d at 177, 344 N.W.2d at 104. In his concurrence, Justice Beilfuss stated that the plain-error doctrine "should be used sparingly and only in cases . . . where a basic constitutional right has not been extended to the accused." *Virgil*, 84 Wis. 2d at 195, 267 N.W.2d at 866. Wisconsin courts have consistently used this constitutional error standard in determining whether to invoke the plain error rule. *See, e.g., State v. Kruzycki*, 192 Wis. 2d 509, 527, 531 N.W.2d 429, 436 (Ct. App. 1995); *State v. Wiese*, 162 Wis. 2d 507, 515, 469 N.W.2d 908, 911 (Ct. App. 1991); *State v. Romero*, 147 Wis. 2d 264, 275 n.3, 432 N.W.2d 899, 904 (1988); *State v. Gustafson*, 119 Wis. 2d 676, 688, 350 N.W.2d 653, 659 (1984).

■

King argues that the admission of Vales' statements violated his Sixth Amendment right to confront his accusers. In support of his argument, King cites *Lee v. Illinois*, 476 U.S. 530, 541 (1986), in which the United States Supreme Court stated: "Our cases recognize that this truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination." The State agrees that Vales' statements incriminating King do not fall within any exception to the hearsay rule. It does not dispute King's contention that he was deprived his Sixth Amendment right to confrontation. Therefore, we conclude that King was denied his confrontation rights.

91

Our analysis does not end with our conclusion that the admission of Vales' statements implicated King's Sixth Amendment rights, however. "[N]ot all constitutional errors are 'plain errors.' Some errors may be constitutional harmless errors." *Neely v. State*, 86 Wis. 2d 304, 320, 272 N.W.2d 381, 388 (Ct. App. 1978), *aff'd*, 97 Wis. 2d 38, 292 N.W.2d 859 (1980). Our courts have required a harmless error analysis when constitutional errors occur and the defense timely objects. *See State v. Mayhall*, 195 Wis. 2d 53, 62, 535 N.W.2d 473, 477 (Ct. App. 1995). We see no reason to abandon this harmless error analysis and give a defendant a right to automatic reversal for constitutional errors when the defense fails to contemporaneously object at trial.

It is also consistent with federal case law for us to use a harmless error analysis in determining whether to invoke the plain error doctrine. Wisconsin's plain error rule is substantially identical to its federal equivalent.[2] In fact, uniformity with the Federal Rules of Evidence was the overriding principle in formulating the Wisconsin rules. John A. Decker, *A New Wisconsin Evidence Code?*, 56 MARQ. L. REV. preface (Winter 1973). Federal case law interpreting a federal rule is persuasive authority in construing an analogous state rule. *Schauer v. DeNeveu Homeowners Ass'n, Inc.*, 194 Wis. 2d 62, 73, 533 N.W.2d 470, 474 (1995).

In *United States v. Olano*, 507 U.S. 725 (1993), the United States Supreme Court undertook the task to "clarify the standard for 'plain error' review." *Id.* at 730. The Court stated that under the plain error doctrine, "the Court of Appeals normally engages in a

---

[2] Rule 103(d) of the Federal Rules of Evidence provides: "**Plain error.** Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."

specific analysis of the [trial court] record—a so-called 'harmless error' inquiry—to determine whether the error was prejudicial." *Id.* at 734. Federal courts have extended the harmless error analysis enunciated in *Olano* to situations in which a codefendant's statements are admitted at trial and plain error is alleged. *See United States v. Foree*, 43 F.3d 1572, 1577-79 (11th Cir. 1995). Likewise, it is appropriate for us to consider whether the admission of Vales' statements was a harmless error.

We also conclude that the State bears the burden of proving that Vales' statements were harmless. In *Neely v. State*, 86 Wis. 2d 304, 320, 272 N.W.2d 381, 388 (Ct. App. 1978), *aff'd*, 97 Wis. 2d 38, 292 N.W.2d 859 (1980), we said that when constitutional errors are involved and plain error is alleged, the state has the burden to show that the error was harmless beyond a reasonable doubt.

This conclusion is inconsistent with *Olano*, in which the Supreme Court concluded that under the plain error doctrine, "It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." 507 U.S. at 734. However, "federal decisions are not binding on state courts in Wisconsin. We are bound only by the United States Supreme Court on questions of federal law." *State v. Sweat*, 202 Wis. 2d 366, 373-74, 550 N.W.2d 709, 711 (Ct. App. 1996) (citation omitted). Published court of appeals decisions have state-wide precedential effect. Section 752.41(2), STATS. Therefore, we follow the pronouncement in *Neely* and place the burden on the State to show that Vales' statements were harmless.

The test for harmless error in Wisconsin is whether there is a reasonable possibility that the error contributed to the conviction. *State v. Dyess*, 124 Wis. 2d 525, 543, 370 N.W.2d 222, 231-32 (1985). The "reasonable possibility" test is substantively the same as the "reasonable probability" test declared by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 694 (1984). *Dyess*, 124 Wis. 2d at 544, 370 N.W.2d at 232. "Our task is to examine the erroneously admitted evidence and the remainder of the untainted evidence in context to determine whether the error was harmless." *State v. Harris*, 199 Wis. 2d 227, 256, 544 N.W.2d 545, 557 (1996).

■

After reviewing the record, we conclude that the admission of Vales' statements incriminating King was harmless beyond a reasonable doubt. Henry originally told Detective Hanson that Vales told her, "me and Jerome robbed a bank." Although Vales' statement implicating King was inadmissible, the part of Vales' statement implicating himself was admissible as a statement against interest. *See* § 908.045(4), STATS. In *Williamson v. United States*, 512 U.S. 594, —, 114 S. Ct. 2431, 2436 (1994), the Supreme Court explained how an accomplice's self-incriminating statement can be used to incriminate a defendant:

> [W]hen seen with other evidence, an accomplice's self-inculpatory statement can inculpate the defendant directly: "I was robbing the bank on Friday morning," coupled with someone's testimony that the declarant and the defendant drove off together Friday morning, is evidence that the defendant also participated in the robbery.

Vales stated, "[I] . . . robbed a bank." Henry told police that Vales took his blue and white jacket with him the morning of October 7, 1993. Witnesses testified that one of the robbers wore a blue and white jacket, and the police found a blue and white windbreaker in a field near the credit union. Henry told police that she found two portions of a nylon on the back floor of her car. Witnesses testified that the robbers wore black nylon stockings over their heads. Henry told police that she found a light-colored pastel pillowcase on her bed after King left. One witness testified that she saw one of the robbers put something into a white pillowcase with pastel flowers on it. This evidence is sufficient for a jury to find beyond a reasonable doubt that Vales robbed the credit union.

Henry also told police that King was with Vales when he returned to her home on October 7, 1993. Henry told police that she called a cab to take King to "Liberty and Bluff." The cab driver testified that on October 7, 1993, he responded to a call to take a passenger to "Bluff and Liberty." Henry told police that King's pockets were bulging with "bundles" and that King talked about getting a new car stereo. A car stereo shop employee testified that King paid him $375 cash to install a cassette player and amplifier in King's car on October 7, 1993. This evidence is sufficient for a jury to find beyond a reasonable doubt that King was with Vales the morning of October 7, 1993, and coupled with evidence that Vales robbed the credit union, is sufficient for a jury to find beyond a reasonable doubt that King participated in the robbery. No reasonable possibility exists that the admission of Vales' statements contributed to the conviction, and therefore the error was harmless.

95

The Wisconsin Supreme Court has stated that "[w]hile the alleged error may be scrutinized to determine whether it amounts to plain error affecting substantial rights, this court's power to do so is discretionary and should be sparingly exercised." *Neely v. State*, 97 Wis. 2d 38, 55, 292 N.W.2d 859, 869 (1980). The United States Supreme Court has stated that a court should exercise its discretionary authority under the plain error doctrine only when such errors "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736. The *Virgil* plurality came to a similar conclusion, stating: "Where a defendant is convicted in a way inconsistent with the fairness and integrity of judicial proceedings, then the courts should invoke the plain-error rule in order to protect their own public reputation." 84 Wis. 2d at 192, 267 N.W.2d at 865. Because any error was harmless, the admission of Vales' statements could not seriously affect the fairness, integrity or public reputation of judicial proceedings. This is not a case where we will reverse for plain error.

## INEFFECTIVE ASSISTANCE OF COUNSEL

██

King argues that he was denied effective assistance of counsel when his attorney did not move for severance or object to the admission of Vales' statements implicating him. To establish ineffective assistance of counsel, King must satisfy a two-pronged test. First, he must show that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, he must establish that the deficient performance was prejudicial. *Id.*

The State concedes for purposes of this appeal that King's counsel performed deficiently when he failed to object to the admission of Vales' statements implicating King. The State argues, however, that the error was not prejudicial.

To establish prejudice, King must show that but for counsel's deficient performance, there is a reasonable probability that the result of the proceedings would have been different. *Id.* at 694. We have already established that the admission of Vales' statements implicating King was harmless beyond a reasonable doubt. Therefore, King was not denied effective assistance of counsel.

## RIGHT TO COMPULSORY SEVERANCE

King argues that the State's failure to advise the court prior to trial of its intention to introduce Vales' statements deprived him of his statutory right to compulsory severance under § 971.12(3), STATS.[3] King argues that because the State deprived him of his statutory right to a separate trial, he should be granted a new trial regardless of whether the error was prejudicial. We disagree.

The language of § 971.12(3), STATS., upon which King relies is intended to provide a mechanism to insure that trials are conducted in conformity with *Bruton v. United States*, 391 U.S. 123 (1968), which prohibits the use at trial of a statement of a codefend-

---

[3] Section 971.12(3), STATS., provides in relevant part:

The district attorney shall advise the court prior to trial if the district attorney intends to use the statement of a codefendant which implicates another defendant in the crime charged. Thereupon, the judge shall grant a severance as to any such defendant.

ant which implicates another defendant. Comments, 1969, WIS. STAT. ANN. § 971.12 (West 1985).[4] In both *Harrington v. California*, 395 U.S. 250 (1969), and *Schneble v. Florida*, 405 U.S. 427 (1972), the U.S. Supreme Court applied a harmless error analysis to *Bruton* violations. Because § 971.12(3) provides a mechanism to insure conformance with *Bruton*, we conclude that the harmless error rule applies to joint trials in which § 971.12(3) is violated. Because the admission of Vales' extrajudicial statements was harmless, King is not entitled to a new trial.

The reasoning in *State v. Leach*, 124 Wis. 2d 648, 370 N.W.2d 240 (1985), *denial of habeas corpus aff'd sub nom. Leach v. Kolb*, 911 F.2d 1249 (7th Cir.), *cert denied sub nom. Leach v. McCaughtry*, 498 U.S. 972 (1990), supports our conclusion. Unlike the issue in the present case, which is whether the harmless error rule applies to misjoinder of *defendants*, the *Leach* court determined that the harmless error rule applies to misjoinder of *offenses*. *Id.* at 671, 370 N.W.2d at 253. However, the reasoning in *Leach* is applicable to both situations. The *Leach* court stated that the purpose of joinder, which is to promote efficient judicial adminis-

---

[4] The comments also provide that § 971.12(3), STATS., is taken from F.R.Cr.P. 14. Rule 14 of the Federal Rules of Criminal Procedure provides in relevant part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

This language is substantially identical to the portion of § 971.12(3) on which King *does not rely*. Therefore, we will analyze the prejudice issue in terms of *Bruton v. United States*, 391 U.S. 123 (1968), not F.R.Cr.P. 14.

tration and court fiscal responsibility in conducting a trial, "would be substantially defeated if a defendant were entitled to separate new trials on all previously misjoined offenses, even when the defendant actually suffered no prejudice from the misjoinder." *Id.* at 671, 370 N.W.2d at 252-53. Likewise, it would be contrary to efficient judicial administration and court fiscal responsibility for us to provide King a new trial when no reasonable juror, when considering the untainted evidence implicating King, could have found him not guilty.

King argues that if he is not entitled to automatic reversal, § 971.12(3), STATS., is effectively eviscerated as prosecutors can simply ignore with impunity their statutory obligation. This is not true, as a codefendant's incriminating statement can be excluded at a joint trial if the prosecution fails to advise the court that it intends to introduce the statement. Thus, the prosecution may lose the opportunity to use the evidence against any defendant. Only in a rare case, like this one, will both parties fail to recognize the hearsay issue and allow the unchallenged admission of a codefendant's inculpatory statements.

*By the Court.*—Judgment and order affirmed.