# COURT OF APPEALS
## DECISION
## DATED AND FILED

## January 13, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.   2021AP1760-FT**

**STATE OF WISCONSIN**

Cir. Ct. No. 2014ME98

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE MENTAL COMMITMENT OF H.V.:

ROCK COUNTY,

    PETITIONER-RESPONDENT,

  V.

H. V.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Rock County: JEFFREY KUGLITSCH, Judge. *Affirmed.*

¶1     NASHOLD, J.[1]  H.V. appeals an order extending his WIS. STAT. ch. 51 commitment and an order for involuntary medication and treatment.  H.V. argues that, under the plain error doctrine, the orders should be reversed because the circuit court admitted unobjected-to hearsay testimony showing current dangerousness.  He further argues that the evidence is insufficient to demonstrate dangerousness.  I decline to invoke the plain error doctrine, and I conclude that the evidence supports recommitment.  Accordingly, I affirm.

## BACKGROUND

¶2     H.V. has been under continuous WIS. STAT. ch. 51 commitment since 2014.   In January 2021, Rock County petitioned to extend H.V.'s commitment.  The court held the extension hearing in February 2021.  Dr. Leslie Taylor, the court-appointed examining psychiatrist, was the only witness; her report was also entered into evidence.

¶3     Taylor testified that H.V. declined to meet for an examination but that she had met with him about a year prior.[2]  For her 2021 report, Taylor reviewed records provided by the County; she also talked with one of H.V.'s providers and with his case manager.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). In an October 27, 2021 order, the court placed this case on the expedited appeals calendar, and the parties have submitted memo briefs.  *See* WIS. STAT. RULE 809.17.  The final brief was submitted to this court on December 17, 2021.  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] The appellate record reflects that Taylor was H.V.'s court-appointed examiner for his 2020 and 2014 commitment proceedings and that she met with him on those respective occasions for thirty minutes and for one hour.

¶4     Taylor testified that H.V. was diagnosed with schizophrenia in 2007 and that she had verified this diagnosis during their last meeting. She opined that schizophrenia remained an appropriate current diagnosis. Taylor testified that there did not appear to be "a change in [H.V.'s] status" since their last meeting, in that H.V. has "ongoing delusions that haven't responded much to various treatments." Specifically, H.V. "has various delusions about being either a lawyer or a doctor, or maybe both," and he "talks about [a female friend] and that he is owed … money, land, and a house."

¶5     Taylor testified that H.V.'s mental illness is treatable with psychotropic medication. She explained that H.V. is administered medication in an injectable form because there has "been an historic issue with compliance": "[w]hen he's not been on commitment, he's not been compliant with his medication." Relatedly, Taylor testified that H.V. would be a proper subject for commitment if treatment were withdrawn:

> I think his treatment team and the records would suggest that [H.V.] doesn't believe that he needs medication and he has not hesitated to tell his treatment team that if he didn't have to take the medication, he wouldn't take it. So if the commitment were to be withdrawn, he would probably stop taking the medication and then his symptoms would get worse and he would become more paranoid and … the delusional thinking would become more intense. And what's happened in the past is that he's kind of acted on his delusional thinking. So that would be a significant risk to the community if he weren't receiving the treatment that at least kind of keeps his delusional thinking at a lower level.

The County then asked, "And in the past you noted he's acted on his delusional thinking. What does that entail?" Taylor responded, "[O]n February 23rd of 2016, he assaulted someone at a bar and he believed that the person was having sex with his ex-wife, and that was a delusion" (I refer to this evidence as "the 2016 assault testimony"). H.V.'s counsel did not object to this testimony.

3

¶6 Taylor opined that H.V.'s history supported recommitment under the "third standard" of dangerousness. *See* WIS. STAT. § 51.20(1)(a)2.c. (an individual is dangerous where he or she "[e]vidences such impaired judgment … that there is a substantial probability of physical impairment or injury to himself or herself or other individuals"). Taylor explained:

> I think that [H.V.] does have impaired judgment and his impaired judgment in the past has led him to behave in a manner that he doesn't do wh[en] he's being treated, such as, you know, acting on his delusional thinking. So injury to maybe others, sort of—again, acting on the paranoid ideas that others are potentially out to get him or to harm him or harm people he cares about.

¶7 Taylor further testified about why H.V. was incompetent to refuse medication and treatment. As part of this testimony, Taylor reiterated that H.V. "doesn't see any need to be on medication" "because he denies that he has a mental illness."

¶8 Taylor summarized her opinion on recommitment as follows:

> So my opinion is that it is clear to me, I guess my professional opinion, that if he's not on a commitment, he'll stop his meds. Even though he is compliant with his injection and he … meets with his case manager, if the commitment is gone, he won't do those things. And then he'll become more ill, and there will be a repeat of kind of what happened that got him the legal charges. Or maybe not exactly that sort of thing, but just sort of acting on the paranoid delusions.

Taylor explained that it was "absolutely not" her "professional opinion that everyone who comes to [her] for a review of their commitment needs to continue on a commitment." Rather, she stated, "I review every case individually, and when people can sort of share some insight and some commitment to treatment,

it's hard to recommend that the extension be continued." H.V., however, "has not shown that insight or commitment."

¶9 Finally, the circuit court asked Taylor, "[W]hat's the likelihood if treatment were withdrawn that [H.V. would become dangerous]?" Taylor responded:

> I think 100 percent likelihood. I mean not necessarily within a day or two or a month of treatment being withdrawn, but eventually I would guess that [H.V.] would engage in the behaviors that would lead him to … have to be hospitalized again.
>
> ….
>
> And … one of the reasons I say that is because even with treatment he still sort of … has ongoing delusional thinking, and that's always a little bit risky if people have a history of acting on the delusional thinking. Then there's a very strong likelihood that that would happen again.

¶10 The circuit court determined that H.V. met the standard for recommitment. It noted that it "doesn't like to" continue "commitment year after year"; however, "the court has to rely on the examining physicians here to make a determination as to whether it's appropriate or not." The court found "telling" H.V.'s "statements that he's made to his treatment team—a treatment team he works very well with—that if the commitment stops, he stops taking the medication." The court explained further:

> [T]he court's had [H.V.] in court before [and he] has consistently indicated he doesn't have a mental illness. I don't think there's any doubt [that] he lacks insight into the mental illness that he does have. But the fact that he continues to say he's going to stop taking his medications is concerning to the court. In previous times, when he was off his medications … the last incident that we have is the 2016 incident where he got into the fight at the bar, believing the patron was having sex with his ex-wife, which was a delusion and caused injury.

5

> … [A]s such, there's dangerousness there…. [Defense counsel was] surprised by Dr. Taylor's response [on the likelihood of recommitment]. So was the court. I did not expect to hear 100 percent likelihood if treatment were withdrawn…. [B]ut there's no doubt in Dr. Taylor's mind that if treatment were withdrawn, [H.V.] is going to do something that's going to be causing potential injury to himself or to somebody else. The fact that she opines that, whether it's realistic or not, the fact that she's got such a belief to even make that statement is concerning to the court.

¶11 In line with Taylor's testimony, the circuit court determined that H.V. was dangerous under WIS. STAT. § 51.20(1)(a)2.c. The court noted, "[J]ust the fact that when he's gone off his medication and hurt others, puts the second standard in play as well." *See* § 51.20(1)(a)2.b. (under the "second standard," an individual is dangerous where he or she "[e]vidences a substantial probability of harm to other individuals"). The court entered an order extending H.V.'s commitment to outpatient care for twelve months. It further determined that H.V. was incompetent to refuse medication and treatment and, accordingly, entered a corresponding order for involuntary medication and treatment. H.V. appeals.[3]

## GENERAL LEGAL PRINCIPLES AND STANDARDS OF REVIEW

¶12 A county initiating a WIS. STAT. ch. 51 involuntary commitment must prove, by clear and convincing evidence, that the subject individual is: (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous under one of five statutory standards set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. ***Portage County v. J.W.K.***, 2019 WI 54, ¶17, 386 Wis. 2d 672, 927 N.W.2d 509;

---

[3] Although H.V. appeals both his recommitment order and his order for involuntary treatment and medication, he does not raise any independent arguments with respect to the latter order. Therefore, I affirm without separately discussing that order.

§ 51.20(1)(a), (13)(e). Pursuant to subd. para. 2.c., the standard at issue here,[4] an individual is dangerous where he or she "[e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omission, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals." However, "[t]he probability of physical impairment or injury is not substantial under [subd. para. 2.c.] if reasonable provision for the subject individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services." *Id.*

¶13 An extension proceeding requires proof of the same three elements, "except that instead of proving dangerousness under [WIS. STAT.] § 51.20(1)(a)2.a.-e., the county may rely on the 'alternative evidentiary path' of § 51.20(1)(am)." *Winnebago County v. S.H.*, 2020 WI App 46, ¶8, 393 Wis. 2d 511, 947 N.W.2d 761 (quoting *J.W.K.*, 386 Wis. 2d 672, ¶19); § 51.20(13)(g)3. Paragraph (am) "recognizes that an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior." *J.W.K.*, 386 Wis. 2d 672, ¶19. Therefore, in proving dangerousness under subd. para. 2.c. in an extension proceeding, "the requirement[] of a … pattern of recent acts or omissions … may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." Sec. 51.20(1)(am).

---

[4] Although the circuit court noted that the "second standard," WIS. STAT. § 51.20(1)(a)2.b., might also apply, it determined that dangerousness was primarily pursuant to the "third standard," subd. para. 2.c. Because the County makes no argument with respect to the second standard, and because I conclude that the County met its burden of establishing dangerousness under the third standard, I need not determine whether the second standard provides an independent statutory basis for dangerousness.

¶14    "Review of an extension order presents a mixed question of fact and law." **S.H.**, 393 Wis. 2d 511, ¶10.  The appellate court upholds factual findings unless clearly erroneous, but it reviews de novo whether those facts satisfy the statutory standard for recommitment.  **Id.**

## DISCUSSION

¶15    H.V. raises two issues on appeal.  First, he contends that the 2016 assault testimony was inadmissible hearsay.  H.V. acknowledges that counsel did not object, but he argues that, under the plain error doctrine, the admission of this testimony constitutes reversible error.  Second, H.V. argues that the sum total of the evidence presented—even taking into account the 2016 assault testimony— does not support a finding, by clear and convincing evidence, that he is dangerous.

*I.  Reversal Is Not Warranted Under the Plain Error Doctrine*

A.  Plain error doctrine

¶16    It is a basic premise of appellate review that courts do not normally consider forfeited issues.  *See* **State v. Ndina**, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612.  Under the plain error doctrine, however, an appellate court may review evidentiary errors that were not objected to below.  **State v. Jorgensen**, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77; *see also* WIS. STAT. § 901.03(4) ("Nothing in this rule [on the effect of erroneous evidentiary rulings] precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the judge.").  Thus, the plain error doctrine authorizes judicial relief to correct an "error so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time."  **Jorgensen**, 310 Wis. 2d 138, ¶21 (internal quotation marks and quoted

source omitted). Under this standard, a court may rely on the plain error doctrine where an individual was denied a fundamental constitutional right or where the right to a fair trial was substantially impaired. *State v. Sonnenberg*, 117 Wis. 2d 159, 176-78, 344 N.W.2d 95 (1984); *see also* *Jorgensen*, 310 Wis. 2d 138, ¶21 ("Wisconsin courts have consistently used this constitutional error standard in determining whether to invoke the plain error rule." (internal quotation marks and quoted source omitted)).

¶17    Because of the importance of preserving issues for review, "[c]ourts should use the plain error doctrine sparingly." *Jorgensen*, 310 Wis. 2d 138, ¶21; *see also* *Ndina*, 315 Wis. 2d 653, ¶30 (setting forth the purposes of the forfeiture rule). Accordingly, "a court should exercise its discretionary authority under the plain error doctrine only when such errors 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" *State v. King*, 205 Wis. 2d 81, 96, 555 N.W.2d 189 (Ct. App. 1996) (quoting with approval *United States v. Olano*, 507 U.S. 725, 736 (1993), which articulates the plain error doctrine under an analogous federal rule of criminal procedure).[5]

¶18    As the first step in a plain-error analysis, the appellant[6] must identify an error that is "fundamental, obvious, and substantial." *Jorgensen*, 310 Wis. 2d 138, ¶23. The burden then shifts to the respondent to show that the error was

---

[5] The federal plain error doctrine differs as to which party must prove harmless error, but in all other general respects, the federal and Wisconsin doctrines are substantially identical. *State v. Jorgensen*, 2008 WI 60, ¶23 n.4, 310 Wis. 2d 138, 754 N.W.2d 77; *State v. King*, 205 Wis. 2d 81, 92, 555 N.W.2d 189 (Ct. App. 1996). Therefore, federal case law may serve as persuasive authority.

[6] I use the term "appellant" as shorthand for the party that forfeited the issue and "respondent" as shorthand for the opposing party.

harmless. *Id*. An error is harmless where the respondent shows, to the requisite degree of proof, that the same trial result would have occurred absent the error. *See id.* Our courts have adopted a multi-part test for determining harmless error in this context, under which the court considers factors such as the strength of the government's case and the importance of the evidence admitted. *Id.*

B. Application to H.V.'s appeal

¶19    H.V. objects to the admission of the 2016 assault testimony.[7] To repeat in context, this testimony is as follows:

> [Taylor:] … So if the commitment were to be withdrawn, he would probably stop taking the medication and then his symptoms would get worse and he would become more paranoid and … the delusional thinking would become more intense. And what's happened in the past is that he's kind of acted on his delusional thinking….
>
> [The County:] And in the past you noted he's acted on his delusional thinking. What does that entail?
>
> [Taylor:] … *[O]n February 23rd of 2016, he assaulted someone at a bar and he believed that the person was having sex with his ex-wife, and that was a delusion.*

(Emphasis added.)

---

[7] Although Taylor's report, like her testimony, includes information about the 2016 assault, H.V. does not challenge the admission of that evidence. For the sake of completeness, I will assume that H.V.'s plain-error argument encompasses the unobjected-to admission of the 2016 assault evidence contained in the report.

In his recitation of the facts in his brief-in-chief, H.V. alludes to the hearsay nature of Taylor's statements on his medication noncompliance, which he characterizes as statements that he "made to his treatment team" and that Taylor merely "referenced." In the argument section of the brief, however, H.V. contends only that the 2016 assault testimony constitutes inadmissible hearsay. Accordingly, this opinion's plain-error analysis focuses only on that testimony.

¶20 As a preliminary matter, I note that H.V. has not established that the 2016 assault testimony is hearsay, which is an out-of-court statement offered for the truth of the matter asserted. *See* WIS. STAT. § 908.01(3). Instead, he merely asserts that Taylor "never explained where she learned of this information." Given, however, that the County does not dispute that the information is hearsay, I will assume that it is for purposes of this discussion.

¶21 H.V. appears to raise two arguments as to why the admission of this testimony was a fundamental, obvious, and substantial error. First, he asserts that "[t]he admission of this hearsay evidence violated [his] due process rights to cross examine and confront witnesses at a recommitment hearing." To the extent H.V. means to assert a Sixth Amendment confrontation clause violation, I reject this argument, as a civil proceeding does not implicate this right. *See Walworth County v. Therese B.*, 2003 WI App 223, ¶10, 267 Wis. 2d 310, 671 N.W.2d 377. Moreover, H.V. cannot be said to have been denied his procedural due process right to question witnesses where he both questioned Taylor and did *not* raise a hearsay objection to the 2016 assault testimony. The right to procedural due process does not encompass the right to a trial free from unobjected-to error. *See United States v. Hasting*, 461 U.S. 499, 508-09 (1983) ("[T]here can be no such thing as an error-free, perfect trial, and … the Constitution does not guarantee such a trial.").

¶22 Second, H.V. points out that, aside from the 2016 assault testimony, the County presented "*no* other evidence of [H.V.'s] current dangerousness." Thus, H.V. may mean to argue that the admission of this testimony violated his substantive due process right in the County's being held to its burden of proof on the elements supporting recommitment. *See Waupaca County v. K.E.K.*, 2021 WI 9, ¶¶2 n.5, 27-28, 395 Wis. 2d 460, 954 N.W.2d 366 (the right to substantive due

process, which protects against arbitrary and wrongful governmental actions, requires the government to prove dangerousness by clear and convincing evidence before an individual is committed). But H.V. fails to identify how his substantive due process rights were violated solely because testimony was received. That unobjected-to hearsay evidence was used to prove dangerousness is not constitutionally equivalent to H.V.'s being committed without sufficient evidence of dangerousness.

¶23    Moreover, as previously noted, the plain error doctrine is discretionary:  a court should invoke the doctrine "only when such errors 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'"  *King*, 205 Wis. 2d at 96 (quoting *Olano*, 507 U.S. at 736).  As our supreme court has emphasized, "[t]he [forfeiture] rule is not merely a technicality or a rule of convenience; it is an essential principle of the orderly administration of justice."  *State v. Huebner*, 2000 WI 59, ¶11, 235 Wis. 2d 486, 611 N.W.2d 727. The principles underlying the forfeiture rule weigh against applying that doctrine in this case.  *See* *Puckett v. United States*, 556 U.S. 129, 134-36 (2009) (articulating how the plain error rule under *Olano* accounts doctrinally for the policy considerations supporting the forfeiture rule).

¶24    Here, for example, a timely hearsay objection might have allowed the County to explain why the evidence was not hearsay, explain why a hearsay exception applied, or introduce other admissible evidence of the 2016 assault or past dangerous acts.  *See* *Ndina*, 315 Wis. 2d 653, ¶30 (forfeiture rule "enable[s] the circuit court to avoid or correct any error with minimal disruption of the judicial process, eliminating the need for appeal," and "gives both parties and the circuit court notice of the issue and a fair opportunity to address the objection"). The forfeiture rule also prevents attorneys from "sandbagging," or "failing to

12

object to an error for strategic reasons and later claiming that the error is grounds for reversal." *Id.* These considerations weigh against finding plain error here, so as to avoid reversal based on the introduction of a single piece of evidence that, in fact, may have been either admissible or rendered unnecessary by the introduction of other admissible evidence.

¶25    Based on the foregoing, H.V. has not established that the application of the plain error doctrine is warranted. I now turn to whether the evidence before the circuit court was sufficient to support recommitment.

### II. The County Presented Sufficient Evidence to Establish Dangerousness Under WIS. STAT. § 51.20(1)(a)2.c.

¶26    H.V. argues that the County presented insufficient evidence of dangerousness under the "third standard," WIS. STAT. § 51.20(1)(a)2.c. As pertinent here, the County had to present clear and convincing evidence that, if treatment were withdrawn, H.V. would evidence such impaired judgment that a substantial probability of physical impairment or injury to himself or others would result. *See **Langlade County v. D.J.W.***, 2020 WI 41, ¶56, 391 Wis. 2d 231, 942 N.W.2d 277 (citing § 51.20(1)(a)2.c., (am)); § 51.20(13)(e).

¶27    I conclude that the County met this burden. The unrefuted evidence shows that H.V. "denies that he has a mental illness," "has not shown … insight or commitment" to treatment, and "doesn't see any need to be on medication." According to Taylor, it is this medication that "keeps [H.V.'s] delusional thinking at a lower level." Without medication, Taylor opined, "the delusional thinking would become more intense" and H.V. "would become more paranoid" "that others are potentially out to get him or to harm him or harm people he cares about." Based on H.V.'s treatment record and history, Taylor predicted that H.V.

13

would "act[] on his delusional thinking" in some type of "a repeat" of past behavior, in which he committed assault because he was under the delusional belief that the victim was having sex with his ex-wife. Thus, Taylor opined that, if treatment were withdrawn, H.V.'s "ongoing delusional thinking," coupled with his "history of acting on the delusional thinking," would create a "100 percent likelihood" that H.V. would "eventually … engage in the behaviors that would lead him to … have to be hospitalized again."

¶28    This undisputed evidence is sufficient to meet the statutory standard for dangerousness under the "third standard," WIS. STAT. § 51.20(1)(a)2.c.  The County showed that, without treatment, H.V.'s delusions would cause "impaired judgment" that, in turn, would cause "a substantial probability of injury to [H.V.] … or other[s]," *see id.*—as Taylor opined, "not necessarily within a day or two or a month of treatment being withdrawn, but eventually."  The County further showed a "reasonable probability" that H.V. would not "avail himself … of [community] services," *see id.*, in that it showed that H.V. does not believe he has a mental illness, does not believe he needs medication, and would not take medication absent a court order, *see* § 51.20(1)(am).

¶29    H.V. argues that the evidence demonstrating current dangerousness is weak because there was no "first-hand witness" testifying that H.V. actually caused physical harm to another person the last time he was unmedicated. Without such testimony, H.V. argues, "it was impossible for the circuit court to assess" dangerousness.  But this argument goes to the weight of the testimony and Taylor's credibility, which are determinations for the fact-finder.  *See Ehlers v. Colonial Penn Ins. Co.*, 81 Wis. 2d 64, 67-68, 259 N.W.2d 718 (1977). Moreover, this argument does not account for the weight the circuit court accorded Taylor's prediction of future dangerousness.  The court may have expressed some

14

skepticism that there was a "100 percent likelihood" of dangerousness if treatment were withdrawn, but at the same time, it was struck by the fact that Taylor expressed such certainty: "The fact that she opines that, whether it's realistic or not, the fact that she's got such a belief to even make that statement is concerning to the court." Thus, it was not clearly erroneous for the circuit court to determine both that H.V. harmed someone when he was delusional and unmedicated and that he was substantially likely to do so again, absent a recommitment order.

¶30 H.V. argues that, aside from the 2016 assault testimony, "Taylor's opinion relied solely on" the fact that he has "benign and nonviolent" delusions (such as his delusion that he is a doctor and lawyer). This argument misrepresents the record. As recounted above, Taylor's prediction of dangerousness was not based on H.V.'s present delusions but on the likelihood that decompensation would cause more severe delusions, which would, in turn, cause dangerous behavior.

¶31 Finally, H.V. argues that he is doomed to be "indefinitely" committed because the testimony at future proceedings will never change: he will always have benign delusions, and the "alleged" 2016 assault will always be part of his treatment history. But this argument, again, misconstrues the basis for recommitment. H.V. was not recommitted solely because of past behavior or present delusions but because of Taylor's informed prediction that the recommitment order prevented decompensation, serious delusions, and, ultimately, dangerous behavior.

¶32 For the foregoing reasons, I affirm the order extending H.V.'s WIS. STAT. ch. 51 commitment and the order for involuntary medication and treatment.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.